STATE of Tennessee, Appellee,

v.

David ZIRKLE, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 13, 1995.

Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

Edward C. Miller, Public Defender and Alan Feltes, Assistant Public Defender, Dandridge, for Appellant.

Charles W. Burson, Attorney General and Reporter, Nashville, Jeannie Kaess, Assistant Attorney General, Nashville, Al Schmutzer, Jr., District Attorney General and Charles Poole, Asst. District Attorney General, Sevierville, for Appellee.

## OPINION

WADE, Judge.

The defendant, David Zirkle, was initially convicted of first degree murder, felony murder, and especially aggravated robbery. Although the state sought the death penalty, the jury declined that option. Initially, the trial court imposed a life sentence for each murder conviction and a twenty-five year sentence for the especially aggravated robbery. The life sentences were to be served concurrently but consecutive to the especially aggravated robbery sentence. Eleven days later, the trial court merged the two murder convictions into a single conviction for first degree murder and modified the sentence to a single life term to be served consecutively to the especially aggravated robbery sentence.

In addition to his challenge to the sufficiency of the evidence, the defendant presents the following issues for review:

(I) whether the trial court erred in denying the defendant's motion for a continuance based on the late appointment of lead counsel;

(II) whether the trial court erred in denying the defendant's motion for a continuance based on the absence of a material witness;

(III) whether the trial court erred in refusing to suppress the defendant's statement;

(IV) whether the trial court erred in allowing a state witness to refer to the defendant by his nickname, "crowbar";

(V) whether the trial court erred in failing to dismiss the especially aggravated robbery count of the indictment in that it failed to allege that property was taken from the victim's person;

(VI) whether the trial court erred in failing to dismiss the felony murder count of the indictment because the indictment for the underlying felony of especially aggravated robbery was defective;

(VII) whether the trial court erred in failing to strike "alias" from the indictment;

(VIII) whether the trial court erred in allowing argument by the district attorney designed to inflame the jury;

(IX) whether the trial court erred in allowing a photograph of the victim's body to be admitted into evidence;

(X) whether the defendant's convictions for first degree murder, felony murder, and especially aggravated robbery subjected him to double jeopardy;

(XI) whether the trial court erred in allowing a codefendant to invoke his fifth amendment privilege without permitting the defendant to cross-examine him;

(XII) whether the trial court erred in allowing the statement of the same codefendant to be admitted into evidence even though he did not testify; and

(XIII) whether the trial court erred in failing to grant the defendant's request for a special jury instruction.

We find no prejudicial error and affirm the judgment of the trial court.

### STATE'S PROOF

Curtis "Jack" Owenby befriended the victim, Larry Sayers,[1] while both men lived in Arizona. After Owenby moved back to Tennessee, he kept in touch with the victim through letters and phone calls. In early April of 1991, the victim telephoned Owenby to say that he would be travelling through Tennessee and planned to stop for a visit. On April 5 of that year, the victim, the defendant, and James Hasinger[2] arrived in a white Courier pickup truck with a camper shell on top. Owenby had no previous acquaintanceship with either the defendant or Hasinger.

The four men spent the evening drinking beer at Owenby's cabin. When they had exhausted their supply of alcohol, Owenby and the victim went to buy more. In order to pay for the beer, the victim took money from a pouch that he wore around his neck.

That night, the defendant and Hasinger slept in the truck. The victim slept inside. When Owenby left for work at around six the next morning, the victim was awake but the defendant and Hasinger were still asleep. Owenby understood that the victim would be waiting for him when he returned from work.

When Owenby got back that afternoon, the three men and the truck were gone. Owenby noticed a spot on the ground which he first thought to be transmission fluid. When the victim had not contacted him by the following morning, however, Owenby re-examined the ground stain and decided that it was either blood or paint. He then noticed that the cap had been taken off his well and that a crowbar had been moved from his front porch. He also found the victim's money pouch on the ground. When he saw that

---

1. The indictment refers to the victim as "Sayers." Otherwise, the transcript provides "Sauers."

2. *See State v. Carl James Hassinger,* No. 03c01–9206–00224, 1993 WL 291725 (Tenn.Crim.App. at Knoxville, August 5, 1993). This transcript refers to the defendant as "Hasinger." Hasinger entered pleas of guilt to first degree murder and especially aggravated robbery.

the contents had been removed, Owenby called the authorities.

On April 7, 1991, Detective Mark A. Holt, of the Sevier County Sheriff's Department investigated at the Owenby residence. He recovered the crowbar and the victim's woven pouch and had them examined. A sample of the fluid found on the ground was sent to the Tennessee Crime Laboratory for testing.

On the next day, Hasinger told Candy Lou Fisher, a teller at Dominion Check Cashing Company in Norfolk, Virginia, that he was "Larry Sayers" and tried to get her to cash a check. The teller asked for identification and became suspicious when the photograph on the card did not resemble Hasinger. When asked to fill out a form, Hasinger misspelled the victim's surname. The teller called the police and waited in the back until two officers arrived and arrested the man.

Keith J. Curry, one of the arresting officers, testified that Hasinger attempted to leave when he saw the police car. The officers blocked his path, patted him down, and took him inside for identification. Upon questioning, Hasinger initially claimed to be Larry Sayers, but later confessed to his true identity.

After his arrest, Hasinger told the officers that he was not alone and provided them with the defendant's name, his description, and the vehicle he was driving. As he was being placed in the police car, Hasinger pointed out the defendant, who was walking in the parking lot of a neighboring business. The officers drove toward the defendant, who started walking in the opposite direction. When Officer Curry ordered him to halt, the defendant asked why he was "being hassled" and denied knowing Hasinger. While frisking the defendant for weapons, Officer Curry found identification bearing Hasinger's name and photograph and then placed the defendant under arrest.

Thereafter, the officers located a truck in the parking lot that fit the description given by Hasinger. When asked if he knew about the vehicle, the defendant claimed that he had never seen it before. Officer Curry, however, had found keys in the defendant's possession that fit the truck's ignition, door, and camper shell.

Investigator Brett Johnson testified that he administered *Miranda* warnings to the defendant and questioned him after he was brought to the Sheriff's Department. Approximately three hours later, the defendant told Investigator Johnson that he had something to say, but that he needed protection from Hasinger. After being assured of his safety, the defendant confessed that he and Hasinger had killed a man in Tennessee.

At trial, the jury heard a tape recording of the confession. The defendant told officers that he met Hasinger at a shelter in California. Both were from the Northeast and wanted to return there. Bus tickets donated by a local church took them part of the way. They intended to hitchhike the rest of the distance. The victim, who was bound for Canton, Ohio, agreed to give them a ride and, according to the defendant, became "mean and bossy" as the trip progressed. The defendant related that the victim stopped in Gatlinburg, while en route, to visit Owenby. That night the defendant claimed that he slept alone in the truck, while everyone else slept inside Owenby's residence. All continued to drink on the following morning and the victim got "bossy." Hasinger struck the victim in the head with a tire iron or crowbar and "made" the defendant help put the victim in the back of the truck before they left. According to the defendant, Hasinger dumped the victim in a creek bed near the North Carolina border. The defendant claimed that the victim, who had asked to be taken to a hospital, was still alive at that point. That night the defendant and Hasinger stopped at a motel in Burlington, North Carolina, where they went through the victim's belongings and disposed of anything that they did not want. The defendant said that they then drove to Virginia Beach where Hasinger tried to cash one of the victim's checks.

At the conclusion of the interrogation of the defendant, Investigator Johnson contact-

ed police in Burlington, North Carolina and Sevierville, Tennessee for assistance. He then questioned Hasinger, who gave a separate statement admitting that the victim had been killed.

During the trial, Investigator Johnson testified that the victim's truck was mistakenly sold by the police department at auction. He identified photographs taken of the inside of the victim's truck which, among other things, showed maps with red markings.

Ricky Earl Lee, a sergeant with the Burlington Police Department, testified that he had received a call from the Norfolk Police Department asking for help in the homicide investigation. Officer Lee searched a dumpster at a Super 8 Motel located in Burlington where he found blood stained clothing, a pair of boots, blankets, and a prescription drug container issued to Larry Sayers. He also obtained a card from the motel showing that Hasinger had paid for a room on April 7 and 8, 1991.

Sevier County Sheriff Don Ogle also assisted in the investigation. He found the victim's body in a dry creek bed close to the Tennessee/North Carolina border. A large rock lay on the right side of the victim's chest and a smaller one near the head. Sheriff Ogle identified a photograph of the body which had been taken at the scene.

Raymond Austin DePriest, a special agent with the Tennessee Bureau of Investigation, compared samples of the victim's blood provided by the coroner to blood taken from the victim's truck, the items located in the Super 8 Motel dumpster, and the crowbar found at Owenby's residence. He testified that samples from the truck and motel were consistent with the victim's blood type. Testing of the crowbar samples produced inconclusive results. By stipulation, it was established that the blood samples found in Owenby's yard were consistent with the victim's blood type. Agent DePriest also testified that the victim had a .19 percent blood alcohol level.

Dr. Cleland C. Blake, a forensic pathologist, performed an autopsy on the victim. Upon his initial examination, he noticed significant injury to the head. The autopsy revealed torn skin, broken bones and several depressed fractures. Dr. Blake estimated that the victim could have lived for up to thirty minutes after the blows were inflicted. He stated that the injuries were caused by blows from a long rod-shaped object, such as the crowbar that had been found at the scene. While confirming that the victim's blood alcohol level was .19 percent, Dr. Blake also remarked that the finding was of little use because bodies go through a fermentation process after death and that there is no way to tell how much · of the percentage reported was caused by the post-mortem process as opposed to alcohol intake. He did discover that the victim had cirrhosis of the liver.

James Daniel Cruise, an inmate in the Sevier County Jail, stated that he was in a cell next to the defendant and that the two became acquainted during their incarceration. Cruise testified that he and others in the jail referred to the defendant as "crowbar." When Cruise asked why, the defendant replied that it was because he and another man had killed someone with a crowbar, had dumped the body behind a guardrail on the interstate, and had placed a rock on the victim's head.

### DEFENSE PROOF

Jeff McCarter, a detective with the Sevier County Sheriff's Department, was called as a defense witness. Detective McCarter had talked with Investigator Johnson about the victim's death and learned that the defendant had been read his constitutional rights just after his arrest. He stated that he understood that the defendant agreed to make a statement only if Johnson could insure his protection. This somewhat contradicted testimony by Johnson to the effect that the defendant had first discussed the forged check incident and then, after some three hours of interrogation, had told of his involvement in the murder.

Del Smith, a volunteer minister at the Sevier County Jail who had held services on

a weekly basis during Hasinger's incarceration, testified that he had obtained a copy of the defendant's statement and discussed it with Hasinger. According to Smith, Hasinger confirmed the accuracy of the defendant's statement and also verified the accuracy of his own unsigned, handwritten statement.

Smith read Hasinger's statement for the jury. In it, Hasinger had stated that he had caused the victim's death by striking him repeatedly on the head with a crowbar. He claimed that he had become enraged when the victim had grabbed him in the groin area. He then asked the defendant to help put the victim in the truck and, later, dispose of the body. Hasinger admitted that he tried to cover the victim with a rock.

Officer Curry was recalled by the defense and testified that while the defendant and Hasinger were both in the back seat of the police car, the defendant had told Hasinger to shut up. Officer Curry acknowledged that he did not include that statement in his arrest summary. He stated that he had examined the victim's wallet and found several of Hasinger's identification cards, but none belonging to the defendant.

Michael T. Evans, who had been incarcerated in the Sevier County Jail at the same time as Hasinger, testified for the defense. He related that Hasinger claimed "he should have killed David [Zirkle] when he had the chance ... cause he ratted on him."

The defendant also called Hasinger as a witness. The jury was excused and Hasinger asserted his fifth amendment right not to testify.

### REBUTTAL PROOF

Investigator Johnson, recalled by the state, testified that Hasinger had incriminated himself only after a lengthy interrogation. In a statement played for the jury, Hasinger claimed that he hit the victim twice with a crowbar after being pressured by the defendant. According to Hasinger, they dragged the victim outside, the defendant hit him with the crowbar, and they placed him in the back

of the truck. Hasinger admitted that they dumped the body at a place near Interstate Forty and before they left, the defendant threw a rock at the victim and proclaimed that he had "got him pretty good that time."

### SUFFICIENCY OF THE EVIDENCE

Initially, the defendant claims that this evidence was insufficient to support his convictions. We disagree.

■ We are guided in our review by several well-established principles. On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as triers of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); Tenn.R.App.P. 13(e).

Initially, we note that while the defendant questions whether the evidence was sufficient to support his conviction for especially aggravated robbery, he makes no argument. After review, however, we find that the evidence clearly supports each element of this offense.

As to the murder conviction, the defendant claims that no reasonable juror could have found him guilty beyond a reasonable doubt because there was no direct evidence that he killed the victim. Further, he asserts that his codefendant, Hasinger, confessed to single-handedly killing the victim. Finally, he claims that the record is devoid of evidence of either premeditation or deliberation, elements which must be specifically proven to

sustain a conviction for first degree murder. *See State v. Brown,* 836 S.W.2d 530 (Tenn. 1992).

Among other things, first degree murder is "[a]n intentional, premeditated and deliberate killing of another" or "[a] reckless killing of another committed in the perpetration of" a robbery or one of several other felonies. Tenn.Code Ann. § 39-13-202(a).

In a conviction where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. *Pruitt v. State,* 3 Tenn.Crim.App. 256, 460 S.W.2d 385, 390 (1970). The trial court has the duty to charge the jury on the weight and significance of circumstantial evidence when it is the only basis upon which the state's case rests. *Bishop v. State,* 199 Tenn. 428, 433, 287 S.W.2d 49, 52 (1956).

■ The jury is governed by four rules when testing the value of circumstantial evidence: (1) the evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; and (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456 (1958).

■ An offense may be proven by circumstantial evidence alone. *Price v. State,* 589 S.W.2d 929, 931 (Tenn.Crim.App.1979). Our scope of review is the same when the conviction is based upon circumstantial evidence as it is when it is based upon direct evidence. *State v. Brown,* 551 S.W.2d 329, 331 (Tenn.1977); *Farmer v. State,* 208 Tenn. 75, 343 S.W.2d 895, 897 (1961).

■ By his own admission to police, the defendant participated in disposing of the victim's body and in searching through his belongings. He and Hasinger took what they wanted and threw away the rest. The jury also chose to accredit the testimony of a jail inmate who said the defendant acknowledged helping kill a man with a crowbar and dumping the body near the interstate. That was their prerogative.

The Hasinger statement, in which he claimed that the defendant had "pressured" him to assist with the killing, alleged that the defendant struck the victim with a crowbar and later, as he helped dispose of the body, struck the victim with a rock. Other circumstantial evidence supports the convictions for murder and especially aggravated robbery. The two men appeared to be acting in concert. They travelled together for several days, both before and after the crimes, until their arrests. The defendant possessed keys to the door, ignition, and camper top of the victim's truck. He had identification bearing Hasinger's name. When initially approached by the arresting officers, the defendant walked rapidly in the opposite direction.

As for the premeditation element, the proof showed that the murder occurred from a number of blows which may have taken place over several minutes or even hours. The chest area of the body, found miles away from the Owenby residence, was covered with a large rock when found by authorities. Certainly there was opportunity for premeditation. By the conduct of the defendant after the killing, the jury could have reasonably inferred that robbery was the primary motive.

As for the deliberation element, all indications are that the defendant acted purposefully helping to kill the victim, robbing him, and, sometime later, secretly disposing of the body. A reasonable inference from all of the circumstances is that the crimes were carried out after sufficient time for thoughtful reflection. In his statement to police, Hasinger claimed that on the day before the murder, the defendant pressured him to find tools to knock the victim unconscious so that they could take his truck and get on with their journey north. He further stated that, on

the day of the murder, the defendant pressured him to strike the first blow.

In summary, while the evidence of these elements was circumstantial, the time frame of the killing, the manner in which it was conducted, the extended joint participation of the defendant, and the nature of the robbery and theft support convictions for murder in the first degree and especially aggravated robbery. Of note is that the death of the victim clearly occurred while the defendant participated in the robbery—sufficient in and of itself to have supported an independent felony murder conviction.

### I

The defendant first asserts that the trial court erred in failing to grant his motion for a continuance because lead counsel was appointed late. The state argues otherwise.

Attorney Allen Feltes was appointed to represent the defendant in April, 1991. Four months later, Attorney Dwight Stokes was appointed as co-counsel. In September of 1991, they requested, and were given, a continuance to more thoroughly prepare the defendant's case. Approximately one month before trial, Attorney Stokes withdrew because of a conflict of interest. Public Defender Edward Miller was appointed in his place.

Because the public defender claimed that his burdensome court schedule precluded adequate preparation, the defendant again moved for a continuance. The defendant claimed that his new attorney's preparation was particularly important because Attorney Feltes had no experience with death penalty cases and that his new counsel had the sole responsibility for the death penalty phase of the trial. The trial court denied the motion.

■ The grant or denial of a continuance rests within the sound discretion of the trial judge. His determination will not be overturned unless there is "a clear showing of an abuse of discretion, to the prejudice of the defendant." *Woods v. State*, 552 S.W.2d 782,

784 (Tenn.Crim.App.1977); *Frazier v. State*, 3 Tenn.Crim.App. 696, 466 S.W.2d 535 (Tenn. Crim.App.1970).

■ Although Attorney Miller was appointed shortly before trial and Attorney Feltes had no prior experience with death penalty cases, the latter had been assisted for several months by Attorney Stokes, who did have some prior experience in death penalty cases. The trial court also found that while Attorney Feltes lacked death penalty experience, he had tried an extraordinarily large number of other criminal cases and was "able counsel." Finally, Attorney Miller could not "cite any specific thing that ha[d] not been done" in preparation for the trial.

For there to be error, the defendant must show that he "did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance." *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn.Crim.App.1973). The record simply does not support that. The defendant's primary complaint is that his counsel had an inadequate amount of time to prepare for the death penalty phase of the trial. Because the jury chose not to impose the death penalty after finding the defendant guilty of first degree murder, the efforts of his new counsel were successful. There was simply no prejudice.

### II

The defendant also insists that the trial court should have granted his motion for a continuance based upon the absence of a material witness, James Long. The state argues that the motion was properly denied.

■ Initially, we note that the defendant has failed to include this motion for a continuance in the record on appeal. It is the duty of the appellant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal. Tenn.R.App.P. 24(b); *State v. Miller*, 737 S.W.2d 556, 558 (Tenn.Crim.App.

1987); *State v. Rhoden,* 739 S.W.2d 6 (Tenn. Crim.App.1987). Generally, this court is precluded from addressing an issue on appeal when the record fails to include relevant documents. *See State v. Bennett,* 798 S.W.2d 783 (Tenn.Crim.App.1990), *cert. denied,* 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); Tenn.R.App.P. 24. By failing to include this motion in the record, the defendant has waived the issue.

Moreover, there is no merit to the claim of error. The record establishes that Long had been incarcerated in the cell next to Hasinger at the Sevier County Jail. According to the defendant, Long would have testified that Hasinger admitted to being insane and killing the victim without any help from the defendant. Long was released, however, before the defendant sought a subpoena and could not be contacted by defense counsel despite several attempts to do so.

■ When requesting a continuance to accommodate a missing witness, the grounds must be set out in an affidavit which alleges (a) the substance of the facts the defendant expects to prove through the unavailable witness; (b) sufficient facts to establish the relevance and materiality of the testimony; (c) the admissibility of the testimony, if the witness was available; (d) the non-cumulative nature of the testimony; (e) the witness' availability at a later date; and (f) due diligence in attempting to obtain the presence of the witness. *State v. Dykes,* 803 S.W.2d 250, 256–57 (Tenn.Crim.App.1990); Tenn.Code Ann. § 19–1–110(a). Failure to file the motion in proper form may be a ground for denial. *State v. Dykes,* 803 S.W.2d at 257.

■ And, while the record fails to show that the defendant filed the required affidavit, it does demonstrate that the trial court found Long to be a material witness whose testimony would be non-cumulative and that the defendant had acted diligently in attempting to secure his presence. Because, however, there is no indication that Long would have been available at a later date, the defendant was unable to meet all requirements. *Id.* at 256–57.

## III

The defendant complains that the trial court erroneously admitted into evidence the statement he made to officers from the Norfolk Police Department.

Initially, the defendant asserts that officers from the Norfolk Police Department lacked reasonable suspicion that he had committed a crime. Absent that, the officers were not authorized to conduct a stop and frisk. Alternatively, the defendant claims he was arrested without probable cause and, therefore, any evidence gathered incident to the arrest should not have been admitted against him.

Shortly after Hasinger tried to cash one of the victim's checks, officers arrested him. He admitted guilt to the arresting officers and also told them that he had not acted alone. He gave a detailed description of the defendant and their vehicle. As Hasinger was placed in the police car, he saw the defendant and told officers "that is Dave." The defendant matched the description that Hasinger had given to the officers. When the officers approached the defendant, he began to walk swiftly away and refused to provide them with identification. Certainly, all of the surrounding circumstances provided officers with reasonable suspicion. At that point, one of the officers conducted a precautionary "pat down" for weapons. He found a wallet during the course of his search which he seized to obtain identification. The identification cards contained Hasinger's name.

■ When a defendant is tried in a Tennessee court but was arrested in another jurisdiction, the legality of the law enforcement officer's conduct is governed by the law of the place of the arrest. *See State v. Hudson,* 849 S.W.2d 309, 311 (Tenn.1993) (holding that Tennessee law only applies where the other jurisdiction was acting on behalf of the state of Tennessee). Therefore, Virginia law applies.

■ Section 19.2–83 of the Virginia Code states as follows:

Authority of Police Officer to stop, question, and search suspicious person. Any police officer may detain a person in a public place if he reasonably suspects he is committing, has committed, or is about to commit a felony or possesses a concealed weapon in violation of section 18.2308, *and may require of such person his name and address.*

Provided further, that such police officer may, if he reasonably believes that such person intends to do him bodily harm, search his person for a dangerous weapon, and if such person is found illegally to possess a dangerous weapon, the officer shall take possession of the same and dispose of it as provided by law.

(Emphasis added). Hasinger had admitted his guilt to Norfolk police officers. He also explained that he was not acting alone and gave them a detailed description of the defendant and of the vehicle the two were using. After he was placed under arrest, Hasinger saw the defendant in an adjacent parking lot and told officers who he was. As the officials approached, the defendant began to walk away. The trial court found that these circumstances established a reasonable basis for the stop. We agree with that assessment.

■ Next, the defendant argues that even if the officers had the reasonable suspicion necessary to conduct a stop and frisk, the officers went beyond the scope of such a search by removing his wallet to check for identification. According to the defendant, it is only when Hasinger's description and statement are combined with the identification found in this frisk that the police had probable cause to arrest him.

Generally, only weapons or objects that appear to be weapons may be seized in the course of a precautionary "pat down" based upon reasonable suspicion. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, the officer found no weap-

ons but did seize the defendant's wallet in order to try to find identification. Under the Virginia code, the defendant had a statutory duty to identify himself and had failed to do so. The officer who seized the wallet testified that he examined the wallet only to identify the defendant, not to collect evidence. The testimony was accredited by the trial court. In consequence, we find no error by the seizure of the wallet.

■ Even in absence of the identification obtained from the wallet linking Hasinger to the defendant, we would hold that the officers had sufficiently reliable information to support an arrest. In *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), Justice Stewart defined probable cause as follows:

> [W]hether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed ... an offense.

When assessing whether such probable cause existed, Virginia has adopted the totality of the circumstances test enunciated in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *see Tart v. Virginia,* 17 Va.App. 384, 437 S.E.2d 219 (1993).[3] Without recounting all of the facts and circumstances known to the officers at the time the defendant was taken into custody, we would hold that the arrest was supported by probable cause.

## IV

The defendant asserts that the trial court erred in allowing a state witness to refer to the defendant as "crowbar" during the course of his testimony. The state argues that use of the nickname was inseparable from other portions of the witness's testimony.

■ Evidence introduced at trial must be relevant to the issue of the guilt or innocence

---

3. Tennessee has retained the more strict Aguilar–Spinelli test which requires a separate inquiry into both the reliability/veracity of the informant and the informant's basis of knowledge. *See State v. Jacumin,* 778 S.W.2d 430, 436 (Tenn. 1989).

of the accused. Tenn.R.Evid. 401. Moreover, the probative value of such evidence must outweigh its prejudicial effect on the defendant. Tenn.R.Evid. 403. Nicknames should generally be avoided. The trial judge should closely monitor any misuse.

■■■ Cruise testified that while he and the defendant were incarcerated in the Sevier County Jail, he asked the defendant how he got the nickname "crowbar." According to Cruise, the defendant told him that he and another man had killed someone with a crowbar. That the defendant admitted to a fellow inmate he had killed someone with a crowbar was highly probative on the issue of the defendant's guilt. And, while the use of the nickname was also prejudicial, its use was limited to establishing the relevance of the defendant's statement. The trial court also provided helpful instruction placing the use of the nickname in its proper context:

> While you were out, the Court explored further the testimony that is to be offered. There were objections made to it. . . . An objection [was] made that the term 'Crowbar' was being used; that that was prejudicial to this defendant. That 'Crowbar' should not be used, that [it] was a jailhouse term. That everybody in the jailhouse knew what the charge was against him. It had been in the newspaper, it'd been discussed, and they knew that somebody . . . had been killed, and that they just dubbed him 'Crowbar.' It was unfair and prejudicial to have the term 'Crowbar' used against him.
>
> You will hear evidence in a minute about a conversation that this prisoner had with this prisoner, Mr. Wilder [sic]. The Court cannot separate, would be impossible to separate the use of the nickname 'Crowbar' from the testimony that is competent and is proper, and you will hear. Now, you will judge the reliability of it; you will judge the truthfulness of it; you will judge the accuracy of it; you will judge what value it has, if any. But because you cannot separate the term 'Crowbar' from the testimony that is clearly competent,

> you will hear the term 'Crowbar,' and you'll hear the testimony which is about to come, and you will judge it, subject to cross-examination. . . .

In summary, we hold that the probative value of the testimony clearly outweighed any prejudicial effect.

### V and VI

The defendant next argues that the trial court improperly refused to dismiss the portion of the indictment charging him with especially aggravated robbery. Count three, in pertinent part, provided as follows:

> [T]hat DAVID ZIRKLE, ALIAS . . . did unlawfully, feloniously and intentionally or knowingly take property, to-wit: personal checks[ ] and a 1980 white Ford Pick-up truck vin # SGTCXG10726 with California license plates, *from Larry Sayers,* by violence or putting said Larry A. Sayers in fear, and where Larry A. Sayers suffered serious bodily injury, said act having been accomplished with a deadly weapon, to-wit: a crowbar, in violation of T.C.A. [§] 39–13–403.

(Emphasis added). More specifically, the defendant contends that the indictment failed to allege an element of the offense, i.e., that property was taken from the victim's person. *See* Tenn.Code Ann. § 39–13–403.

■■■ In *State v. Smith,* 612 S.W.2d 493 (Tenn.Crim.App.1980), our court held as follows:

> The test for the sufficiency of an indictment is whether it contains the elements of the offense intended to be charged; sufficiently apprises the defendant of what he must be prepared to meet; and in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Id.* at 497; *see State v. Morgan,* 598 S.W.2d 796, 797 (Tenn.Crim.App.1979).

■■■ Robbery is defined as follows:

[T]he intentional or knowing theft of property from the person of another by violence or putting the person in fear.

Tenn.Code Ann. § 39–13–401(a). Especially aggravated robbery is robbery as defined in § 39–13–401(a), accompanied by the use of a deadly weapon and serious bodily injury to the victim. Tenn.Code Ann. § 39–13–403(a). Thus, the indictment must charge and the state must prove that property was taken "from the person" of the victim in order to sustain a conviction for especially aggravated robbery.

The defendant insists that the words "from the person" are critical to the sufficiency of the indictment. We do not agree. Webster's Dictionary defines the word "from" as "a source." Webster's Dictionary and Thesaurus 71 (1992). Black's Law Dictionary defines the term as "a starting point, whether it be of time, place, or condition; and meaning having a starting point of motion, noting the point of departure, origin, withdrawal, etc." Black's Law Dictionary 600 (6th ed. 1990). In light of these definitions, a logical interpretation is that the defendant was alleged to have taken the property "from Larry Sayers," a person. Because the indictment specifically identified the victim of the crime, it was sufficient, in our view, to fairly apprise the defendant of the nature of the charge. See State v. Smith, 612 S.W.2d at 497.

As a corollary ground for relief, the defendant argues that the indictment for felony murder should have been dismissed because it insufficiently charged the underlying felony, i.e., especially aggravated robbery. Because we have determined that especially aggravated robbery was adequately set out, this additional claim is no basis for relief.

### VII

█ The defendant contends that the trial court committed prejudicial error when it refused to strike alias from the indictment. We cannot agree.

When the defendant was initially approached by law enforcement officers, he refused to identify himself. In the course of frisking the defendant for weapons, Officer

Curry found identification bearing the name of Hasinger, rather than that of the defendant.

Proof of the use of an alias supports its inclusion on the indictment. Young v. State, 566 S.W.2d 895, 899 (Tenn.Crim.App.1978) (explaining that one who misidentifies himself to police officers has no basis to complain if an alias is used on indictment). Generally, however, the word should be stricken if there is no evidence to show a purpose for its inclusion. Young v. State, 566 S.W.2d at 899. Nevertheless, inclusion of the term will not be deemed reversible error absent a showing of prejudice to the defendant. State v. Stephenson, 878 S.W.2d 530 (Tenn.1994).

The defendant correctly points out that the trial court found that the term "alias" was not applicable but still refused to strike the term. While that might be considered erroneous, the trial court ordered counsel to refrain from the use of the term. Under those circumstances, any error would clearly not have affected the results of the trial.

### VIII

The defendant also complains that the trial court erred by allowing the prosecutor to make inflammatory remarks during closing argument:

> Been some—you've heard just a very—very little bit about Larry [Sayers] in this case. There's no one here really, other than myself, to speak for Mr. [Sayers]. [He] [c]ertainly can't speak for himself.

> \* \* \* \* \* \*

> What little we know about him, we know that he was a disabled Vietnam veteran. We know that he had a severe drinking problem. It was brought out, in cross-examination, that he had cirrhosis of the liver. The proof here was he drank pretty heavily. Don't know if he went—probably disability or whatever. Sad. One thing else we know about Mr. Larry [Sayers]: He had a big heart. He was—excuse me.

> You know, it's an ironic twist of fate—apologize, your Honor. It's an ironic twist

of fate that this act of charity, ended up being dead. Man may not have had much, but he was willing to share it. But these men—in particular this man right here—was so concerned about his death, after they dumped him out over there on the state line, that they went to rest over there in Burlington, even went on to Norfolk, seeing how far they could go on his money and his checks. . . .

The defendant objected midway through this portion of the state's argument. The trial court overruled the objection and allowed the prosecutor to continue this line of argument.

Our courts have traditionally provided counsel with a wide latitude of discretion in the content of their final argument. Argument is a privilege that should not be unduly restricted. Trial judges are accorded wide discretion in control of the argument. *See Russell v. State,* 532 S.W.2d 268 (Tenn.1976).

■ However, every person charged with a crime has the right to a fair and impartial jury, one protected from inflammatory argument. *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758 (1965). The courts of Tennessee have recognized that commentary regarding the personal characteristics of the victim in a murder case is generally irrelevant and designed to evoke juror sympathy. *See State v. Hensley,* 656 S.W.2d 410, 414 (Tenn.Crim.App.1983). It is preferable for counsel in criminal cases to limit their commentary to the facts and circumstances of each case.

■ The test to be applied in reviewing prosecutorial misconduct is whether "the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State,* 385 S.W.2d at 759. The factors are set out in *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976), as adopted by the Tennessee Supreme Court in *State v. Buck,* 670 S.W.2d 600, 609 (Tenn. 1984): (1) the conduct complained of, viewed in light of the facts and circumstances of the case, (2) the curative measures undertaken by the court and the prosecutor, (3) the intent of the prosecutor in making the improper statement, (4) the cumulative effect of the improper conduct and any other errors in the record, and (5) the relative strength or weakness of the case.

■ Here, the prosecutor's argument, while designed to appeal to the sympathies of the jury, contained both positive and negative comments about the victim. The negative remarks included the fact that the victim had been a heavy drinker and had cirrhosis of the liver. In that context, it is very unlikely that the argument had any effect upon the results of the trial. Neither the trial court nor the prosecutor took any steps to cure the error. Other than an attempt to appeal to the sympathies of the jury, there appears to have been no improper intent on the part of the prosecutor. And, although circumstantial, proof against the defendant was relatively strong. No other significant errors have been found in the record. By the use of these factors, we conclude that any error was harmless.

## IX

Next, the defendant asserts that the trial court erred by allowing a photograph of the victim's body into evidence. The state incorrectly claims that the photograph is not included in the record on appeal and fails to address the issue on the merits.

■ The admissibility of photographs from the scene of the crime is governed by Tennessee Rule of Evidence 403 and *State v. Banks,* 564 S.W.2d 947 (Tenn.1978). The evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn.R.Evid. 403; *State v. Banks,* 564 S.W.2d at 950–951. Whether to admit the photographs is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. *State v. Allen,* 692 S.W.2d 651 (Tenn.Crim. App.1985).

■ Here, the photograph was taken where the body was found. The contents are

not particularly gruesome. Because the photograph shows a rock upon the victim's chest, it tended to corroborate Hasinger's statement to police.

And, because the defendant was charged with first degree murder, the state had to prove intent, deliberation and premeditation to warrant a conviction. All of the circumstantial evidence was important in that regard. *See* Tenn.Code Ann. § 39–13–202(a)(1). Here, the record demonstrates that the victim, if not already dead, was substantially incapacitated by the time Hasinger and the defendant left him near the North Carolina border. That the defendant threw a rock at the victim was material to establish intent as well as the other elements of the crime. Consequently, the photograph had probative value. In our view, that value outweighed any prejudicial effect. *See State v. Zagorski,* 701 S.W.2d 808, 813–14 (Tenn. 1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986); *State v. Duncan,* 698 S.W.2d 63, 69 (Tenn.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *State v. Teague,* 645 S.W.2d 392, 397–98 (Tenn.1983).

## X

The defendant also claims that his convictions for first degree murder, felony murder, and especially aggravated robbery subjected him to double jeopardy. The state argues otherwise.

The double jeopardy guarantees of the fifth amendment to the United States Constitution and Art. I, § 10 of the Tennessee Constitution protect individuals against a second prosecution for the same offense after either acquittal or conviction. *Ohio v. Johnson,* 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984). Moreover, the safeguards noted also protect against the imposition of multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *see State v. Black,* 524 S.W.2d 913 (Tenn.1975).

Though the defendants initial convictions for both premeditated first degree murder and felony murder subjected him to double jeopardy, the trial court ultimately merged those convictions into a single conviction for premeditated first degree murder. The jury also returned separate guilty verdicts for both the felony murder and premeditated first degree murder, indicating that the jury was satisfied that the proof supported a conviction for either offense. Our independent review of the record leads us to the same conclusion. Under similar circumstances, our supreme court held that while it was error to impose two sentences for a single killing, vacating one of the murder convictions cured the double jeopardy problem. *State v. Hurley,* 876 S.W.2d 57 (Tenn. 1993), *cert. denied,* — U.S. —, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994).

In light of these factors, we have no difficulty concluding that the defendant was not subjected to double jeopardy here. Perhaps the merger procedure would have been prejudicial if the jury had chosen to impose the death penalty. A merger has been generally defined as follows:

> The fusion or absorption of one thing or right into another; generally spoken of a case where one of the subjects is of less dignity or importance than the other. Here the less important ceases to have an independent existence.

> \* \* \* \* \* \*

> When a man commits a major crime which includes a lesser offense, or commits a felony which includes a tort against a private person, the latter is merged in the former.

Black's Law Dictionary 1140 (6th ed. 1990). When a defendant is convicted of felony murder in this state, the underlying felony may not be used as an aggravating circumstance in the death penalty phase of the trial. *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn. 1992), *cert. dismissed,* — U.S. —, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993); Tenn. Code Ann. § 39–13–202(a)(1) and (2). The felony may be used, however, when the defendant has been found guilty of premeditat-

ed first degree murder. Thus, while a merger of these two offenses is not error, the issue of whether the underlying felony may be used in the death penalty phase under our state constitutional guidelines has not yet been resolved. Here, it makes no difference. The jury chose not to sentence the defendant to death. The end result is that the defendant stands convicted of one count of first degree murder and a term of life imprisonment.

The defendant also asserts that his convictions for both especially aggravated robbery and felony murder are precluded by double jeopardy principles. Because, however, we have concluded that the felony murder conviction merged into the conviction for premeditated first degree murder, this issue has been preempted. Dual convictions of especially aggravated robbery and premeditated first degree murder do not violate double jeopardy protections. *See Welch v. State*, 836 S.W.2d 586, 588–89 (Tenn.Crim.App. 1992). Moreover, even if the merger here had resulted in a single conviction for felony murder, the conviction for especially aggravated robbery would stand. *State v. John Robert Tory*, No. 03C01–9306–CR–00202, 1994 WL 398808 (Tenn.Crim.App. at Knoxville, August 3, 1994) (holding that a conviction for felony murder and the underlying felony of especially aggravated robbery did not violate double jeopardy principles); *see also State v. Blackburn*, 694 S.W.2d 934 (Tenn.1985).[4]

### XI

The defendant next contends that the trial court erroneously refused to allow him to cross-examine Hasinger. After the defendant called Hasinger to testify, the trial court held a jury-out hearing to inquire of Hasinger whether he intended to invoke his fifth amendment privilege. Hasinger responded affirmatively and the trial court ruled that he could invoke the privilege.

Tenn.R.Evid. 611(b) provides that a witness "may be cross-examined on any matter relevant to any issue in the case, including credibility...." On the other hand, Tenn.R.Evid. 501 states that "[e]xcept as otherwise provided by constitution, ... no person has a privilege to ... (2) refuse to disclose any matter...." This rule permits a witness to refuse to disclose any matter upon assertion of the right against self-incrimination. Specifically, this court has stated that "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, ... the right against self-incrimination is the stronger and paramount right." *State v. Dicks*, 615 S.W.2d 126, 129 (Tenn.), *cert. denied*, 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981). Moreover, "[t]he right of a co-defendant ... to exercise his Fifth Amendment privilege against self-incrimination has a greater force than the right of a mere witness to the same privilege." *State v. Baker*, 751 S.W.2d 154 (Tenn.Crim. App.1987).

It is the duty of the trial court to determine whether a witness has properly invoked his fifth amendment right against self-incrimination. *State v. Stapleton*, 638 S.W.2d 850, 855 (Tenn.Crim.App.1982). While the right of cross-examination is fundamental, its exercise is controlled by the discretionary authority of the trial judge. *Davis v. State*, 186 Tenn. 545, 212 S.W.2d 374 (1948); *Hobbs v. State*, 3 Tenn.Crim.App. 238, 460 S.W.2d 377 (1970). Only a plain abuse of that authority constitutes grounds for reversal. *State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460 (1963); *State v. Black*, 618 S.W.2d 526, 528 (Tenn.Crim.App.1981).

Hasinger stood accused of the same crimes as the defendant. He had not been tried by the time of this trial. The record demonstrates that the two men acted in concert in the commission of these crimes. Inferentially almost anything Hasinger said

---

4. The defendant cites a line of cases beginning with *Acres v. State*, 484 S.W.2d 534 (Tenn.1972), to support this proposition. Those decisions,

however, have been overruled. *See Pryor v. Rose*, 724 F.2d 525, 530 (6th Cir.1984).

was potentially incriminating. Also apparent from this record is that Hasinger had discussed this matter with his attorney and that it was upon advice that he chose to invoke the privilege. Under those circumstances, we find no error in the trial court's refusal to allow Hasinger to be questioned.

### XII

The defendant argues that the trial court further erred by allowing the state to admit an inculpatory statement made by codefendant Hasinger despite the fact that Hasinger invoked his fifth amendment privilege not to testify. The defendant claims that the admission of the statement violated his right to confrontation.

Initially we note that the defendant has waived this issue by failing to object to the statement's admission at trial. *Teague v. State,* 772 S.W.2d 915, 926 (Tenn.Crim.App. 1988), *cert. denied,* 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989). Further, the issue was not raised in the defendant's motion for new trial. Issues not presented in the motion for new trial are waived. Tenn. R.App.P. 3(e); *State v. Muse,* 637 S.W.2d 468 (Tenn.Crim.App.1982); *State v. Durham,* 614 S.W.2d 815 (Tenn.Crim.App.1981). We have chosen, however, to address the issue on the merits.

The defendant introduced one of the statements made by codefendant Hasinger during his case-in-chief. The statement, which exculpated the defendant, had been written by Hasinger and given to a minister who visited the Sevier County Jail where Hasinger was incarcerated. The defendant also called Hasinger to testify but the court allowed Hasinger, who had not yet been tried, to invoke his fifth amendment privilege. In rebuttal, the state introduced another statement made by Hasinger to the police which incriminated both himself and the defendant.

 Generally, the entry of a non-testifying co-defendant's statement which implicates the defendant is a violation of the latter's right to confrontation. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This rule is designed to avoid presenting evidence to the jury without affording them the opportunity to evaluate the context in which the statement was made and the veracity of its maker. *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965).

Here, the defendant, rather than the state, first introduced a statement made by Hasinger. That placed Hasinger's credibility at issue. A portion of Tennessee Rule of Evidence 806 is applicable:

> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

Because the trial court determined that Hasinger had properly asserted his fifth amendment privilege when called by the defendant to testify, he qualified as an unavailable witness. *See* Tenn.R.Evid. 804(a)(1). Therefore, the admission of another statement by Hasinger, which was inconsistent with the one placed into evidence by the defendant, appears to fit squarely within the category of admissible impeachment under Rule 806. Moreover, the trial judge carefully explained that Hasinger's statement introduced by the state could be considered for impeachment purposes only and did not qualify as substantive evidence. *See Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926). Thus, we find no error.

### XIII

 Finally, the defendant submits that the trial court improperly denied his request for a special jury instruction. In pertinent part, the trial judge charged as follows:

> The fear constituting an element of robbery is fear of *present* personal peril from violence offered or impending.

(Emphasis added.)

The defendant submitted the following as more appropriate:

That if you the jurors find that a killing occurred prior to the defendant's forming any intent to take the property of the victim, you must return a verdict of not guilty of robbery.

Unlike the defendant, we find almost no difference between the charge given and the instructions sought.

The defendant has a right to have each issue of fact properly submitted to the jury for resolution. *See Poe v. State,* 212 Tenn. 413, 370 S.W.2d 488, 489 (1963). Consequently, trial judges must instruct the jury fully on all issues fairly raised by the proof. *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). Yet, when the general jury charge is complete, the trial court need not grant the defendant's request for special instructions. *State v. Blakely,* 677 S.W.2d 12 (Tenn.Crim.App.1983).

The trial court's instruction made clear that in order to convict for robbery, the state must prove that the victim had to fear for his safety concurrently with the taking of his property. The defendant's special instruction would provide no further insight. Moreover, the instruction included in the Tennessee Pattern Jury Instructions is almost identical to that provided by the court here. *See* T.P.I.–Crim. 9.03 (3d ed. 1992). Thus, we find no error.

Accordingly, the judgment of the trial court is affirmed.

PEAY and TIPTON, JJ., concur.