IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. SUSAN BLACKBURN

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-87-498      Donald P. Harris, Judge**

---

**No. M1999-00295-CCA-R3-CD - Decided July 25, 2000**

---

The Defendant, Susan Blackburn, was charged with driving under the influence of an intoxicant and driving with a blood alcohol content of .10 percent or more. She was subsequently tried by jury in Williamson County and found guilty of third-offense driving under the influence. In this appeal as of right, the Defendant argues that the trial court erred by overruling her motion for mistrial based on prosecutorial misconduct, by improperly instructing the jury concerning the Defendant's level of blood alcohol concentration, by allowing the prosecutor to make improper remarks during closing arguments, and by improperly denying the Defendant's motion to suppress the results of her blood tests. We hold that the trial court properly overruled the Defendant's motion for mistrial based on prosecutorial misconduct, that the trial court properly instructed the jury with regard to the Defendant's blood alcohol concentration, that the trial court did not abuse its discretion by overruling the Defendant's objection to remarks made during closing arguments, and that the trial court did not err by overruling the Defendant's motion to suppress the results of her blood tests. Accordingly, we affirm the Defendant's conviction.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Trial Court Affirmed.**

WELLES, J., delivered the opinion of the court, in which SMITH, J., and WOODALL, J., joined.

Lee Ofman, Franklin, Tennessee, for the appellant, Susan Blackburn.

Paul G. Summers, Attorney General and Reporter, Kathy Morante, Assistant Attorney General, Ron Davis, District Attorney General, Lee Dryer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On April 13, 1998, the Defendant, Susan Blackburn, was indicted by the Williamson County Grand Jury on charges of driving under the influence of an intoxicant and driving with a blood alcohol concentration of .10 percent or more. The third count of the indictment asserted that the

Defendant had been previously convicted of two prior D.U.I.'s. Following a jury trial conducted on December 8 and 9, 1998, a Williamson County jury convicted the Defendant of third-offense driving under the influence. She received a sentence of eleven months, twenty-nine days incarceration and was placed on eleven months, twenty-nine days supervised probation, conditioned upon her serving 150 days "day-for-day" and upon her participation in an alcohol treatment program. The trial court also revoked the Defendant's driving privileges for five years and fined her $2,500.

The Defendant now appeals as of right from the judgment of the trial court, raising the following issues for our consideration: (1) whether the trial court erred by overruling the Defendant's motion for mistrial based on prosecutorial misconduct; (2) whether the trial court improperly instructed the jury on the .08 percent presumption pursuant to Tennessee Code Annotated § 55-10-408(b) after the Defendant had been indicted on a charge of driving with a blood alcohol concentration of .10 percent; (3) whether the trial court erred by allowing the prosecutor to make improper remarks during closing arguments; and (4) whether the trial court improperly denied the Defendant's motion to suppress the results of her blood tests. We affirm the judgment of the trial court.

The Defendant incurred the charges in this case on January 13, 1998. Officer Bill Ball[1] of the Williamson County Sheriff's Department testified at trial that he was driving to work at approximately 10:30 p.m. when the Defendant's car turned onto the road in front of his vehicle. When the Defendant increased her speed to fifty-five miles per hour in a thirty-five mile-per-hour speed zone, Officer Ball activated his emergency equipment. The Defendant, who had been traveling in the left-hand lane, pulled to the right-hand lane and stopped for a moment. However, before Ball could get out of his car, the traffic light at which the Defendant had stopped turned green, and the Defendant turned left from the right-hand lane across the left-hand lane of traffic. Ball followed with his lights and siren still activated until the Defendant stopped at a stop sign. As Ball began to exit his vehicle in order to approach the Defendant's car, the Defendant again pulled forward. She finally came to a full stop a couple of blocks past where she had first turned left.

Officer Ball stopped behind her, exited his vehicle, and approached the Defendant's car. The Defendant was sitting in the car with the motor running, but apparently was initially unaware of Ball's presence. Because the Defendant would not roll down her window, Ball opened her door and reached inside the vehicle to turn off the motor. Ball asked the Defendant how much she had had to drink, and she responded that she had had three or four drinks. Ball next asked the Defendant if she knew where she was, and she responded that she was in Brentwood, although she was actually in Franklin. Ball testified that the Defendant reported she had just left "the country club in Brentwood," which he understood to mean the Brentwood Country Club.

---

[1] Because the transcript of the trial in this case consists of a video record, the spelling of names of witnesses may be inaccurate.

Officer Ball requested that the Defendant get out of her car, but the Defendant did not seem to understand the officer's questions. Ball stated that he eventually "coaxed" the Defendant out of the car, and when she emerged, she was unable to stand or walk on her own. Ball and Officer Debbie Rogers, whom Ball had summoned as "back-up," helped the Defendant to Ball's police vehicle and put her inside. Ball stated that he did not have the Defendant perform any field sobriety tests because she was unable to stand on her own.

When asked to describe other signs of intoxication he noted on the night of the Defendant's arrest, he stated that he first noticed an odor of alcohol coming from both the Defendant's car and her person. He also recalled that the Defendant's clothes were in disarray and that her shirt was unbuttoned. He reported that she gave answers which were unrelated to the questions asked of her and that she was laughing and crying intermittently. Ball testified that she also appeared to "fall[] asleep off and on" while sitting in the back of his police vehicle. Ball stated, "Frankly, I'd never had anyone that drunk in my car before."

Ball testified that he became concerned that something else might be wrong with the Defendant, so at the urging of the Defendant, he called her daughter. Due to a hearsay objection, Ball did not relate to the jury any conversation that he may have had with the Defendant's daughter. However, he testified that he did ask the Defendant whether she was on any medication, and he stated that her response was unrelated to the question. Ball also testified that he did not remember the Defendant ever mentioning blood pressure problems or telling him that she needed her blood pressure medication.

After escorting the Defendant to his police vehicle, Officer Ball discussed the implied consent form with the Defendant and asked her if she would be willing to go to the hospital and consent to a blood test. She agreed, and they proceeded to a hospital, where she signed an implied consent form and submitted to a blood test. Ball stated that he read the implied consent form to the Defendant twice before she signed it and that she said she understood the form before signing it. He explained that despite her erratic behavior, she appeared to have periods of lucidity when she seemed to understand what was happening. He believed that she understood the form when she signed it.

Officer Rogers, also of the Williamson County Sheriff's Department, whom Officer Ball summoned on the night of the Defendant's arrest, testified that the Defendant was one of the most intoxicated drivers she had ever seen. She reported that the Defendant "ramble[d]" in answering questions, that she was crying and laughing at different points during the arrest process, that her clothes were in disarray, and that the seat of the Defendant's pants was wet. Rogers inventoried the Defendant's car and found two twelve-packs of beer, one opened and one unopened. Several cans, some filled with beer, were scattered in the car, and one can, which was sitting on the seat next to the driver, was half full and still cold. In addition, Rogers discovered a cushion on the driver's seat which was wet. Rogers maintained that the Defendant never mentioned using blood pressure medication, and Rogers reported that when asked whether she took any medication, the Defendant responded that she did not. Rogers also stated that the Defendant claimed to understand the implied

consent form and agreed to take the test. Rogers adamantly maintained that she believed the Defendant understood the form.

Holly Turbeville, a forensic toxicologist at the Tennessee Bureau of Investigation Crime Laboratory, presented the results of blood tests performed on the Defendant on the night of her arrest. Turbeville reported that the Defendant's blood had an alcohol concentration of .31 grams percent ethyl alcohol. Turbeville testified that a 150-pound person would have to consume fourteen to sixteen alcoholic beverages on an empty stomach to reach a blood alcohol concentration (B.A.C.) of .31 percent.

Warren James Woodford, a self-employed chemist who stated that he had conducted independent examinations of evidence in criminal trials since 1974, testified for the defense. He criticized testing methods employed by the T.B.I. Crime Lab. Specifically, he complained that the laboratory heated blood samples to sixty degrees Celsius, much higher than the normal body temperature of thirty-one degrees Celsius. He testified that the T.B.I. Crime Lab uses the "head space method," by which they test the vapor from the blood to determine alcohol content. He explained that when a blood sample is heated to such a temperature, "the vapor [rising from the blood] gets enriched [with alcohol] exponentially," causing faulty test results. Woodford also criticized the laboratory's method of transferring blood between test tubes during testing and claimed that the machines used in testing did not allow for human error; he explained that technician error could cause results to "balloon false positive against [the defendant], depending on the amount of blood" put into the machine. In addition, he complained that there is a "sex bias" in B.A.C. testing because some women "read" twice as high as men. Finally, he stated that he had some experience with handwriting analysis and reported that the Defendant's signature on the implied consent form "look[ed] like a sober signature." On cross-examination, Woodford admitted that he had never examined any of the equipment at the T.B.I. Crime Laboratory and that the "trend" nationwide was to increase the temperature to which blood is heated to sixty degrees Celsius. He also admitted that a person with a high tolerance to alcohol would have better coordination skills at a high level of intoxication than would someone who does not drink.

Stephanie Ann Miller testified that she rented a room from the Defendant. She recalled that on January 12, 1998, the day before the Defendant's arrest, she and Brad Weaver, another of the Defendant's tenants, borrowed the Defendant's car. Miller stated that Weaver bought two "twelve-packs" of Natural Light beer on January 12, and they drank the beer while sitting in the car. Miller reported that they threw the empty cans on the floorboard of the car and did not clean out the car that evening. Miller further testified that she saw the Defendant on the day of her arrest. She stated that she did not see the Defendant drink any alcoholic beverages that day and recalled that the Defendant did not appear to be intoxicated when she left for the country club.

The Defendant testified on her own behalf. She maintained that she was not intoxicated at the time of her arrest and insisted that her strange behavior and confusion was caused by a lack of blood pressure medicine. The Defendant reported that she was five feet, two and a half inches tall and that at the time of her arrest, she weighed 194 pounds. She stated that she had had a stroke in

1991, and she took medication to regulate her high blood pressure. The Defendant recalled that she forgot to take her medication on January 12, 1998, and she stated that she did not want to take the skipped medication the following morning, fearing that she might "collapse" if she took too much medication in one day. She explained that she therefore planned to take the medication the following evening, the night of her arrest.

The Defendant described the events surrounding her arrest as follows: She left her home at 6:15 p.m. to go to a songwriters' night at the Maryland Farms Country Club, where she arrived at approximately 6:35 p.m. While there, she drank three beers and a glass of wine, which she ordered at approximately 9:30 p.m. She did not feel the effects of alcohol when she left the country club, but she began to feel dizzy as she drove home due to what she believed was her rising blood pressure. On the way home, she "got lost" and began to feel confused. She saw Officer Ball's blue lights behind her but initially did not know that the officer was targeting her. She claimed that when she did pull over, she became wedged between a pillow that she used behind her back while driving and the steering wheel of the car; she explained that her efforts to free herself caused her blouse to become unbuttoned. The Defendant insisted that she told Officer Ball she needed her blood pressure medicine because she "was afraid [she] was going to have a stroke." She claimed that she was hurrying home to get her medication at the time she was stopped. She stated that she also asked Officer Ball to call her daughter to get her medicine.

The Defendant claimed to remember being read the implied consent form, but stated that she did not think it mattered whether she signed the form as long as she got to the hospital. She claimed she wanted to go to the hospital to have her heart checked. She was unsure of when or where she signed the form. She claimed she could not clearly remember some of the events on the night of her arrest because of her high blood pressure, and she admitted that she was incoherent for a while that night. The Defendant maintained that when she reached the hospital, she asked someone to check her blood pressure, but did not know whether anyone actually did so. On cross-examination, the Defendant insisted that she had never been so intoxicated that she was unable to remember events. She also claimed never to have "passed out" from drinking.

## I. PROSECUTORIAL MISCONDUCT

The Defendant first argues that the trial court erred by overruling her motion for mistrial based on prosecutorial misconduct. During the cross-examination of defense expert Warren Woodford, the prosecutor asked Dr. Woodford if he had ever been inside the Georgia Bureau of Investigation Crime Laboratory, and Dr. Woodford responded that he had. The prosecutor then asked, "You are no longer allowed to do that, are you?" Dr. Woodford responded that he was in fact allowed in the lab. Counsel for the defense immediately objected, and the trial court then conducted a jury-out hearing. During the hearing, the State admitted that it had no "extrinsic evidence" that Mr. Woodford had been barred from the G.B.I. Crime Laboratory, and counsel for the defense moved for a mistrial. At the conclusion of the hearing, the trial court determined that there was not a sufficient basis for the State's question, but overruled the Defendant's motion for mistrial.

-5-

When the jury reentered the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen of the jury, sometimes a question is asked in such a way as to make one that hears the question think that the questioner has a basis for asking the question. [The prosecutor] asked Mr. Woodford if he had been barred from the Georgia Crime Laboratory, which would indicate that he had some information that he was basing his question on. . . . Mr. Woodford's answer was that no, he had not, and the court has determined that there really wasn't a sufficient basis for [the prosecutor] to ask that question. So I'm just going to ask you to disregard both the question and the response.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn.Crim.App. 1996). This Court will not disturb such a ruling absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn.1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn.Crim.App.1996). Furthermore, we must presume that the jury followed the trial court's explicit instructions not to consider the inappropriate comment. State v. Smith, 893 S.W.2d 908, 923 (Tenn.1994).

Here, the trial court determined that there was not a sufficient basis for the question asked of Mr. Woodford, and therefore the question was improper. However, in light of the trial court's prompt curative instruction and the record as a whole, we find that the trial judge did not abuse his discretion in refusing to grant a mistrial.

## II. JURY INSTRUCTIONS

The Defendant next argues that the trial court improperly instructed the jury with regard to her level of blood alcohol concentration. The trial court first instructed the jury that

> [a]ny person who commits the offense of driving with an alcohol concentration in their blood of ten-hundredths of one percent (.10%) or more is guilty of a crime. If you find the defendant not guilty or if you have a reasonable doubt as to her guilt, you must acquit her of driving with an alcohol concentration in her blood of ten-hundredths of one percent or more and proceed to consider her guilt or innocence of driving under the influence of an intoxicant which is an alternative form of the same offense.

The trial court next instructed the jury as follows: "Evidence from the [blood alcohol] test that there was, at the time alleged, eight-hundredths of one percent (.08%) or more by weight of alcohol in the defendant's blood, creates an inference that the defendant was under the influence of such intoxicant, and that her ability to drive was impaired."

The Defendant argues that the instruction citing the .08 percent presumption conflicts with Count II of the indictment in this case, which requires a blood alcohol concentration of .10 percent for conviction. She argues, "By giving the jury both instructions, you risk a verdict of guilt based on .08% whereas the indictment mandates a verdict of .10%. In other words, in this case, the jury could convict the Defendant on less evidence than called for in the indictment." The Defendant also contends that the instruction citing the .08 percent presumption allowed the jury to "hear evidence of [the] Defendant's prior [D.U.I.] convictions," and she complains that the trial court did not determine that the Defendant was a multiple offender prior to instructing the jury.

Tennessee Code Annotated § 55-10-401 governs the present case. It provides as follows:

> It is unlawful for any person to drive or be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is [sic] generally frequented by the public at large, while:
> (1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or
> (2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more.

Tenn. Code Ann. § 55-10-401(a). Furthermore, Tennessee Code Annotated § 55-10-408 states that in order to prove a violation of Tennessee Code Annotated § 55-10-401(a)(1), driving under the influence of an intoxicant, "evidence that there was, at the time alleged, ten-hundredths of one percent (.10%) or more by weight of alcohol in the defendant's blood shall create a presumption that the defendant's ability to drive was sufficiently impaired thereby to constitute a violation of § 55-10-401(a)(1)." Id. § 55-10-408(a).

However, in a case where a defendant has been convicted of one or more prior D.U.I.'s, the jury may presume that the defendant was under the influence of an intoxicant if it finds beyond a reasonable doubt that his or her blood alcohol level was .08 percent or higher. See id. § 55-10-408(b). "The jury, however, is free to disregard that presumption and rely strictly on the evidence presented at trial. In addition, the defendant may rebut the presumption by introducing evidence to the contrary." State v. Michael Elmore Robinson, No. 01C01-9612-CC-00536, 1999 WL 16802, at *3 (Tenn. Crim. App., Nashville, Jan. 19, 1999). This Court has

> conclude[d] that in D.U.I. cases, the trial court must make the determination of the defendant's prior convictions, if any, outside the presence of the jury. If the trial court finds by a preponderance of the evidence that the defendant has a prior D.U.I. record, then the court shall charge the jury under the standard set forth in Tenn. Code Ann. § 55-10-408(b).

Id. at *4.

In the present case, although the trial judge apparently did not make an explicit determination that the Defendant had been previously convicted of two prior D.U.I.'s, it is clear from the record that he did make such a finding. During both the hearing on the motion to suppress and the trial itself, the trial court referred to the Defendant's prior D.U.I. record, noting her two prior D.U.I. convictions. Her prior record is not now contested.

We find no error in the jury instructions in this case. In Count I of the indictment, the Defendant was charged with violation of Tennessee Code Annotated § 55-10-401(a)(1), driving under the influence of "an[y] intoxicant, marihuana [sic], narcotic drug or any drug producing stimulating effects on the central nervous system." In Count II of the indictment, the Defendant was charged with violation of Tennessee Code Annotated § 55-10-401(a)(2), driving with a blood alcohol concentration of .10 percent or more. Thus, the trial judge properly instructed the jury that it could find the Defendant guilty of driving with a blood alcohol level of .10 percent. In addition, because the trial judge determined that the Defendant had a prior D.U.I. record, he properly instructed the jury that it could presume that the Defendant was driving under the influence if it found that she was driving with a blood alcohol concentration of .08 percent. See id. This instruction corresponds with Count I of the indictment, charging the Defendant with violation of Tennessee Code Annotated § 55-10-401(a)(1).

The Defendant's argument that "the jury could [have] convict[ed her] on less evidence than called for in the indictment" is also moot. The jury specifically convicted her of driving with a blood alcohol concentration of .10 percent, in contravention of Tennessee Code Annotated § 55-10-401(a)(2), and Count I of the indictment, charging her with driving under the influence of an intoxicant, was dismissed. This issue is therefore without merit.

## III.  CLOSING ARGUMENTS

During his closing argument, the prosecutor addressed defense expert Warren Woodford's criticisms of the T.B.I. Crime Laboratory's testing methods. Specifically, he addressed Mr. Woodford's assertion that the lab's method of transferring of blood between test tubes could involve human error, thus falsely inflating test results. For instance, Woodford suggested that the technician conducting the blood test could allow a small amount of blood to dribble down the outside of the test tube, resulting in less blood for testing and thus affecting the amount of alcohol measured by the machines. During closing arguments, the prosecutor stated, "common sense tells you that if there's less blood [in a sample], there's less alcohol," resulting in a lower "reading." By this, the prosecutor apparently meant that even if one were to accept Woodford's claim that human error could cause faulty test results, the types of error mentioned by Woodford would cause lower test results, thereby favoring the Defendant. The Defendant contends that this argument was based on facts outside the record and involved information that could only be presented by an expert.

Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be pertinent to the issues being tried. State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). As is commonly recognized, closing arguments are an important tool for the parties during

the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, see State v. Bigbee, 885 S.W.2d 797, 809 (Tenn.1994), and trial judges in turn are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn.Crim.App.1995). This discretion will not be interfered with on appeal in the absence of abuse thereof. Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). To succeed on a claim of prosecutorial misconduct, the defendant must show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his or her detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965).

While it may be that the inference argued by the prosecutor in this case requires more expertise than common sense, we cannot conclude that the trial court abused its discretion in overruling the Defendant's objection to the argument. As previously noted, the trial judge has wide discretion in controlling closing arguments. See Zirkle, 910 S.W.2d at 888. Here, the argument objected to by the defense was only a brief part of a lengthy closing argument. Furthermore, the trial court provided the following instruction to the jury prior to deliberations:

> Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them.
> You are the exclusive judges of the facts in this case. Also, you are the exclusive judges of the law under the direction of the court. You should apply the law to the facts in deciding this case. You should consider the evidence in light of your own observations and experiences in life.

In view of this instruction, all of the evidence presented at trial, and the relative brevity of the argument at issue, we are unconvinced that the prosecutor's statement affected the verdict to the detriment of the Defendant. We therefore conclude that the trial court did not abuse its discretion by overruling the Defendant's objection to this argument.

## IV. MOTION TO SUPPRESS

Finally, the Defendant argues that the trial court erred by overruling her motion to suppress the results of her blood test. Tennessee Code Annotated § 55-10-406 governs implied consent to "[t]ests for alcoholic or drug content of blood." It provides that "[a]ny person who drives any motor vehicle in the state is deemed to have given consent to a test for the purpose of determining the alcoholic content of that person's blood . . . ." Tenn. Code Ann. § 55-10-406(a)(1). However, it also provides that "[a]ny person who is unconscious as a result of an accident or is unconscious at the time of arrest or apprehension or otherwise in a condition rendering that person incapable of refusal, shall be subjected to the test . . . , but the results of thereof shall not be used in evidence against that person in any court or before any regulatory body without the consent of the person so tested." Id. § 55-10-406(b). The Defendant argues that at the time of her arrest, she was "otherwise in a

condition rendering [her] incapable of refusal . . . ." Id. She contends that she was so incoherent and confused on the night of her arrest that she was incapable of refusing the test.

When reviewing the grant or denial of a motion to suppress,

> [q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997).

At the hearing on the motion to suppress in this case, three witnesses testified. Stephanie Ann Miller, the Defendant's tenant, presented essentially the same testimony as she did at trial. In addition, she testified that when the Defendant fails to take her blood pressure medication, she "gets very confused and . . . stutters. . . . Her face turns real red. She can't catch her breath." Officer Bill Ball also presented essentially the same testimony as he did at trial: He described his encounter with the Defendant on the night of her arrest and maintained that "throughout the whole process," she was "in and out" of coherency. He recalled that there were times during the process when she seemed to understand what he was saying and appeared to be coherent. For example, Officer Ball testified that when she asked him to call her daughter, she provided him with the correct phone number. He reported that he believed she understood the implied consent form. He further testified that both before and after the Defendant signed the implied consent form, she stated that she was "afraid to take a shot."

The Defendant testified on her own behalf at the hearing. Contrary to her later testimony at trial, she reported that she did not remember Officer Ball reading the implied consent form to her and did not remember signing the form. She stated that she remembered Officer Ball "mentioning a hospital," but thought that he mentioned the hospital in reference to her high blood pressure. She further testified that she remembered being at the hospital and thought that hospital staff would check her blood pressure.

At the conclusion of the evidence, the trial judge accredited the testimony of Officer Ball, stating that "nothing" the Defendant had said was truthful. He then made the following findings : He pointed out Officer Ball's testimony that the Defendant "understood that if she agreed to take

-10-

[the] test, it was going to involve sticking a needle in her arm" and concluded,

> So she was able to think clearly enough that she knew when she took the test what the result of that would be. And that's certainly circumstantial evidence that would show me that she was also capable of refusing to take the test. So I find that she was capable of refusing to take the test. I might also say that because she probably blacked out and couldn't remember is really of little consequence without some kind of expert testimony. . . . I understand people who have serious drinking problems black out, but . . . that's not proof that they don't know what they're doing at the time they do things they can't later remember.

We conclude that the evidence presented at the hearing on the motion to suppress does not preponderate against the trial court's findings of fact. At the hearing, Officer Ball indicated his belief that the Defendant was capable of understanding the consent form and explained why he reached this conclusion. The trial court specifically accredited his testimony over that of the Defendant. As previously stated, conflicts in evidence are entrusted to the trial court as the trier of fact. See State v. Odom, 928 S.W.2d at 23. We thus conclude that the trial court did not err by denying the Defendant's motion to suppress.

Accordingly, we affirm the judgment of the trial court.