IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2007

## STATE OF TENNESSEE v. JARVIS HARRIS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 03-00441, 03-00442    Arthur T. Bennett, Judge**

---

**No. W2006-02234-CCA-R3-CD  - Filed August 24, 2007**

---

The defendant, Jarvis Harris, was convicted of first degree premeditated murder and attempted first degree murder and sentenced to concurrent terms of life imprisonment and eighteen years. On appeal, he argues: (1) the trial court erred in denying his motion in limine to exclude references to gang affiliation and the State made improper comments about gang membership during opening and closing statements; (2) the trial court erred in denying his motion to suppress his statements; and (3) the trial court imposed an excessive sentence. Based on our review, we affirm the judgments of conviction but remand for appropriate resentencing for the attempted first degree murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and
Remanded for Resentencing**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

James O. Marty (on appeal) and Joshua B. Spickler (at trial), Memphis, Tennessee, for the appellant, Jarvis Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant and two codefendants, Maurice Thomas and Thaddeus Johnson, were indicted for the first degree premeditated murder of Montrell Graham and for the attempted first degree murder of Maurice Wooten. The defendant subsequently filed a motion to suppress his statements to the police and a motion in limine to exclude any references to gang affiliation, both of which were

denied by the trial court. Following a jury trial in December 2005, the defendant was convicted of the indicted charges.

## Suppression Hearing

Lieutenant Anthony Craig of the Memphis Police Department testified that he was the case coordinator for the investigation of the April 11, 2002, murder of Montrell Graham. Through his investigation, he learned that the defendant's vehicle had been seen in the area of the shooting five minutes prior to the murder. Following the defendant's arrest, Lieutenant Craig and Sergeant Fitzpatrick took a statement from the defendant on April 14, 2002. Lieutenant Craig advised the defendant of his rights, and the defendant signed an advice of rights form at 6:13 p.m. The defendant's interview began at approximately 10:00 p.m. and ended at 12:25 a.m. the following morning, at which time the defendant signed his statement. Lieutenant Craig said that the defendant's interview was not recorded or videotaped. He stated that the defendant knew he was being held on a homicide charge, was cooperative during the interview, and never asked for a lawyer or to talk to his family. The defendant initially denied any involvement in the murder, saying that he had taken his girlfriend to a doctor's appointment at the time of the shooting. However, the defendant later admitted that he was in the area of the shooting with "Little E."[1] The defendant also told Lieutenant Craig about an altercation that occurred during a dice game on April 5, 2002, in which Maurice Wooten was accused of having stolen some marijuana. The defendant told Lieutenant Craig that, as a result, a contract with the Vice Lords was made on Wooten's life.

After interviewing Eric Cooper and Maurice Wooten, Lieutenant Craig interviewed the defendant again on April 16, 2002, because Cooper had given him additional information regarding the defendant's participation. The defendant was again advised of his rights and then gave another statement in which he explained his involvement in the murder:

> Thursday evening I was in the Oakshire Apartments, me and some partners and Lil E. Rell[2] was calling my phone several times to come pick him up and to go get his check. . . .

> I took Rell out to the Olive Garden to get his check. While he was in there getting his check, me and Lil E was still in the car. . . . So I left the Olive Garden and took him to Fastcheck on Winchester near Perkins. . . . So I was intending to drop him back off back home but he wanted to go kick it with me, smoke some weed. He said come on let's go to the hood and get some weed but we never did find no weed.

> So I pulled up in the cut in the Oakshire and saw Maurice and Trail, Melvin sitting on the green box. I tried to reverse back out and then Rell said go back in so

---

[1] At trial, Eric Cooper testified that his nickname was "Little E."

[2] At trial, Eric Cooper testified that codefendant Thaddeus Johnson was known as "Rell."

everybody could see he was with me so I could be his alibi. So I pulled back out and go to the next cut on the left of the building. So then we get out, we just chilling right now. . . . So Rell asked to use my phone, he was calling Bookie first. He had called Bookie and asked Bookie for a 9mm. Bookie had told him yes, it's at the house. So then Rell had got on the phone with Maurice and asked where he's at and all that and he said he was at the Mall.

So he kept on rushing Maurice to come on to the hood saying it's time, several times. Rell said it's "21 bricks execution," it's time, this was Traveling Vice-Lord stuff. Then Rell said "it's got to be done, it's got to be done, it's a hit. I can't let it go no longer, it's got to be done tonight." So after that Rell tried to call Bookie again, he called him about four or five times but Bookie didn't answer. . . . We had left the back apartments in the Oakshire, then we had went to the front of the apartments where the big loop at and then Rell was saying just drop me off over Maurice's house.

But before I could drop him off at Maurice's house, Maurice was in the front of the apartments already. So we go to the front but on the backside of the front and park. Me, Maurice and Rell talking, he saying he need some "black stuff." So, me, Maurice and Lil E went to Maurice's house to get some ski masks, some gloves[,] some shoes and some black jogging pants, black ski mask and a gold ski mask. So by the time we get around the apartments in front, I'm thinking I'm fixing to get ready to drop Maurice off. So Rell jumped and grabbed one of my phones, then I had said "what you doing with that phone?" I say "give me my phone back," he said he was going to use this phone to get in touch with me. So after they changed their clothes, Maurice had already changed at the house, he had on black. Rell changed clothes, putting his orange shoes and orange shirt in my back seat of my car. Then he gave me his money and stuff . . . .

And Maurice['s] cell phone and Chicago bulls cap, leather, it was on my back seat. So then me, Lil E and Lil B[3] jumped in my car. Rell and Maurice was walking off towards the field. I told Rell not to lose my phone; it would lead back to me. So after I dropped B off, me, Lil E rides around the Whitehaven View Apartments. So I'm thinking the shooting fixing to go on but it didn't. So Rell called me on my phone telling me he don't see him or nothing. So he told me to come back to the apartments, now we on the last cut on the right.

I pulled up and see them standing out; they got their all black on and two caps on, so I pulled up in the cut and g[o]t out. . . . That's when I said I want that "bright bitch twin dead" because he walked up behind me when I walking off like he wanted to shoot me in my back and stuff. So now I'm leaving back out and Rell called me

---

[3] The defendant later identified "B" as Brandon, a member of the Traveling Vice Lords.

and said pull up in the cut to see where they at.  So I pulled up in the cut, he said tell me where they at.  So I said they tuck back in the cut, all the way in the cut.  I said both of them is.

By then I pulled out the cut, so I stopped by Citgo to get me something to drink.  I went back to the Whitehaven View Apartments now.  Me and Lil E parked, I told Lil E to sit right here in my car and told him to lock my doors.  After that I jumped back in the car, I pulled around to the other side of the Whitehaven View because Rell suppose to had come over there after the shooting.  I pulled to the other side that's when I heard nine shots; it sounded like nine shots because of the echo in the apartments.  I'm riding back real fast over the speed bumps.  So Rell called me on the phone running through the field talking about pick me up behind Granny's Market.

I pulled out the apartments, me and Lil E and the light was red so I shot through Citgo way through Freezeway.  They was behind Granny's already waiting on me.  So instead of me going behind Granny's cut, I just pulled up right behind Joey's cut; it's like a poolhall bar.  So then they jump in behind Joey's so nobody wouldn't see them getting in my car.   So Rell talking about let's go get some weed and stuff.  I dropped Maurice off at the house.  Maurice said his gun was missing, it wasn't shooting.  Rell had said "I shot that bitch, that bitch dropped, I shot him some more."  So I said which one you have shot?  So he said the bright twin, the one I wanted dead. . . .  Bookie called me, I told Rell be quiet so Bookie wouldn't hear him.  Bookie had said, "you know Trail dead mane," so I said for real, what happen[ed]?  Then Bookie asked where Rell at, I said he ain't with me though.  So I hung up and then I said to Rell "you shot the one with the freckle face with the gold teeth," and I was real mad.  And we was cussing each other out.  I was saying to Rell you shot the wrong person, you shot an innocent person, has never done nothing . . . to nobody.  So I came back and said had you even shot the bright twin and then that's when he came on and told the truth, he said naw.  Rell was saying fuck that shit.  So by the time we left Joey's, I dropped Maurice right off, he asked if he could borrow $10.00.

Nobody had no change at the time so I dropped him off.  We pulled out his driveway going on to the Shelby Inn.  So Rell was talking about we need to get a room to smoke some weed. . . .  We're still cussing and arguing each other out.  So he changed clothes in the room.  I said "mane you shot the wrong one, you fucked off the mission."  So he telling me fuck that shit . . . he changing clothes.

Rell say I got to burn these clothes shoes everything.  So we left out the room, they went out to the back where my car was parked and I went to the front.  So I walked back to the back and Rell had his clothes in a plastic bag, I opened my trunk to get some power steering fluid and he had put it on the clothes.  He had burnt the

clothes slowly, then we just sat there for about five minutes. I told E make sure nobody ain't coming while the clothes were burning.

We get back in the car and pull out and took Rell home. We was still arguing, he said "fuck that shit, I don't want to hear no more about it, the shit done now." So I take him home.

Lieutenant Craig said the defendant made several corrections to his second statement and initialed each page.

Lieutenant Craig acknowledged that he knew Officer Eddie Bass but denied that Bass was present during the defendant's interview. He said that Officer Bass was a uniformed patrol officer at the time and would not have had access to homicide cases because officers from other departments are not allowed to speak to a suspect unless approval is obtained from a supervisor. He testified that Sergeant Reginald Morgan was related to the defendant and was removed from the case as a result. He denied that Morgan was present during the defendant's interviews and said there was no way Bass or Morgan could have talked to the defendant without his knowledge because, as the case coordinator, he was given notification of anyone desiring to speak to the defendant. He said the defendant was offered food and drink and an opportunity to use the restroom.

The defendant testified that he was a high school graduate and could read and write. He said that he was arrested at about 3:45 p.m. on April 14, 2002, and taken to the homicide office where he was handcuffed to a chair for six to eight hours. He said Lieutenant Craig and Sergeant Fitzpatrick showed him a photograph of Montrell Graham and read him his rights. He said he asked for a lawyer four or five times but later signed a waiver of rights form saying he did not want a lawyer. After about two hours, his cousin, Eddie Bass, Jr., a detective with the Memphis Police Department, came to see him while he was still in the large area room of the homicide office. He told Bass, who was dressed in plain clothes, that he wanted an attorney, but Bass told him that he did not need one and that he should tell the officers everything he knew and not go to the penitentiary for someone else. The defendant said that Bass and Reginald Morgan later told him they were "going to work everything out." He denied that the officers ever gave him any food or drink or allowed him to use the restroom. He said that after sitting handcuffed in a chair for about six hours, he was moved to another room where his statement was typed by a transcriptionist. He acknowledged that his statement reflected what he had said that night and that he initialed and signed it, explaining that he did so because Bass "came in and undermined [him]." He said the officers never asked him if he belonged to a gang.

The defendant admitted that he "left something out" in his first statement. He said that he was incarcerated between April 14 and April 16 and was taken to the homicide office again around 7:00 a.m. on April 16. He was interviewed by Lieutenant Craig and another officer for six or seven hours. He said that he asked for an attorney but was not asked to sign a waiver of rights form at the time of his second statement. However, he admitted that he knew he had a right to a lawyer when he read the first waiver. He acknowledged that he made corrections to his second statement, as well as initialed each page and signed it.

At the conclusion of the hearing, the trial court found that the defendant had given both of his statements freely and voluntarily and denied the motion to suppress.

## Trial

Lucille Nevels testified that Montrell Graham was her nephew and that he was twenty-two years old when he was killed. Ms. Nevels explained that she was testifying as the family representative because Graham's mother died thirteen days after he did.

Eric Cooper testified that his nickname was "Little E" and that he had known the defendant for about two years. He said that the defendant, Thaddeus Johnson, and Maurice Thomas were members of the Vice Lords. He said he was riding around with the defendant smoking marijuana on April 11, 2002, when Johnson, also known as "Rell," called the defendant. The defendant picked up Johnson at his house, and the three men then picked up and cashed Johnson's paycheck before going to the Oakshire Apartments to buy more marijuana. When they arrived at the apartments, the defendant told Johnson that Maurice Wooten was "still out there." They then drove around to the front of the apartments where the defendant and Johnson got out of the car and talked to Maurice Thomas while Cooper remained in the car. The defendant, Cooper, Johnson, and Thomas then went to Thomas' house where Thomas retrieved some dark-colored clothing.

Cooper testified that the four men returned to the Oakshire Apartments, and Johnson and Thomas changed into the dark clothes. The defendant gave Johnson one of his cell phones and told Johnson to call him when he was "through." Cooper and the defendant then went to another apartment complex down the street "to post up," or "sit and wait." A short time later, Cooper heard gunshots and the defendant then received a phone call from Johnson. The defendant and Cooper drove to Granny's Market across the street from the Oakshire Apartments. Johnson and Thomas came up to the defendant's car, and Johnson said, "I shot that Bitch." The defendant drove Thomas to his mother's house, and Cooper, Johnson, and the defendant went to a hotel on Shelby Drive where the defendant told Johnson that he shot the wrong person.[4] Johnson changed his clothes and burned the dark clothing behind the hotel.

Cooper testified that he subsequently gave a statement to the police and identified the defendant from a photographic lineup. He said he did not know that the defendant had a problem with Maurice Wooten until after the shooting when the defendant told him that he had a problem with Wooten. Cooper acknowledged that he did not hear the defendant tell anyone to do anything.

Maurice Wooten testified that Montrell Graham was his best friend and that he had known the defendant since elementary school. He said the defendant and other members of the Vice Lords accused him of stealing some marijuana at a dice game on April 5, 2002, six days before the murder of Graham. Wooten said that on April 11, 2002, he, Graham, Melvin Stuckey, and Antonio Taylor

---

[4]According to Cooper, Maurice Wooten was the intended victim.

were socializing "in the cut"[5] of the Oakshire Apartments when the defendant, Thaddeus Johnson, and one or two other men drove up in the defendant's gray Crown Victoria automobile. He described what happened next: "And all of a sudden they pulled out the cut and rolled off. Ten minutes later there went a gunshot. We heard shots. And me and my Bo, Bo, me, Melvin and Antonio, we running for our lives." Wooten said one of the men chased and shot at him and Stuckey, and he heard another gun being fired nearby. He said he ran to his mother's house, and he and his brother later returned to the Oakshire Apartments and saw the police and an ambulance. Wooten said he also saw the defendant at the apartments after the shooting. Wooten explained that he knew the defendant was a member of the Vice Lords because the defendant "was steadily telling [him] and throwing . . . signs up." He said the defendant previously had tried to recruit his brother in the Vice Lords.

Officer Frankie Muhammad of the Memphis Police Department testified that he responded to the scene of the crime where he found the victim lying on the ground between two apartment buildings by a green utility box. He said the victim had a bullet wound to his head and was pronounced dead on arrival by emergency medical personnel.

Sergeant Shan Tracy of the Memphis Police Department testified that he responded to the crime scene which was near Oakshire Elementary School. He described the location of the crime as "kind of a walkway or a grassy area between two . . . apartment buildings. And then to the north there was a fence and a gate in the fence where you could go to the school." Sergeant Tracy and another officer prepared a sketch of the crime scene, which was admitted into evidence. Blood was found on the green electrical transformer box, and a spent bullet was recovered from the victim's broken cell phone found in his pants pocket. Sergeant Tracy said the victim appeared to have several gunshot wounds.

Sergeant Danny James of the Memphis Police Department testified that on April 16, 2002, he responded to a call about some burnt clothing at the Shelby Inn on Shelby Drive. He took photographs of the burnt clothing and collected some of it as evidence.

Lieutenant Anthony Craig reiterated much of his testimony from the suppression hearing. He said that when he interviewed the defendant on April 14, 2002, the defendant initially denied that he was at the scene of the shooting and said that he had taken his girlfriend to a doctor's appointment. However, when Lieutenant Craig contacted the defendant's girlfriend, she denied that the defendant was with her that day. Lieutenant Craig said the defendant did not appear to be under the influence of alcohol or drugs. After talking to Eric Cooper on April 15, 2002, Lieutenant Craig again interviewed the defendant on April 16, 2002. He said that the defendant's statement was reduced to writing, and the defendant initialed each page and corrected several typographical errors throughout the statement before signing it. At the request of the State, Lieutenant Craig read the

---

[5]From photographs of the apartment complex admitted into evidence, "the cut" appears to be an opening between two apartment buildings with a chain-link fence separating the complex from a school.

defendant's statements to the jury. Both statements were marked as exhibits and admitted into evidence.

On cross-examination, Lieutenant Craig testified that, according to the arrest ticket, the defendant was arrested at 3:40 p.m. on April 14, 2002. When the defendant arrived at the homicide office, he was placed in an interview room. He said that the defendant's initial oral statement, in which he denied any involvement in the homicide, was not reduced to writing and that the defendant gave the oral statement before he executed the advice of rights form at 6:13 p.m.

Clara Benson testified that in 2002 she was a transcriptionist for the Memphis Police Department Homicide Bureau. She identified the defendant's April 16, 2002, statement as one she had typed and said she typed only what the defendant said. She said she worked with Lieutenant Craig, Sergeant Fitzpatrick, and other officers, and the officers always treated suspects "very nice" and furnished them food if they were hungry.

Dr. Teresa Campbell, a forensic pathologist, testified that she performed an autopsy on the victim on April 12, 2002, and determined the cause of death to be multiple gunshot wounds. She said that the defendant had a gunshot wound to the left temporal area, which penetrated the brain, and one to the back upper part of the right thigh, which struck the femur bone and lacerated a branch of the femoral artery. The bullets from both wounds were recovered and collected as evidence.

The defendant did not present any proof.

**Sentencing Hearing**

The defendant's mother, Carolyn Harris, testified at the February 23, 2006, sentencing hearing that the defendant was twenty-four years old and that she and the defendant's father had been married for twenty-two years. She said that the defendant had grown up in Memphis, completed high school, and been employed at UPS and as a part-time lifeguard at the local YMCA. She stated that the defendant had been in a major fight in high school, which had resulted in his transfer to a different school, but other than that had never caused her any problems. On cross-examination, she denied any knowledge of the defendant's membership in a gang.

At the conclusion of the hearing, the trial court found enhancement factors (3), (4), and (11) applicable based on the defendant's role in setting up the murder and the fact that individuals besides the named victims were present in the area at the time of the shooting. See Tenn. Code Ann. § 40-35-114(3), (4), (11) (2003). The defendant did not propose any mitigating factors and the trial court apparently found none applicable, as it did not mention any at the sentencing hearing. The trial court, therefore, sentenced the defendant as a Range I, violent offender to eighteen years for the attempted murder conviction, to be served concurrently with his life sentence for murder.

# ANALYSIS

## I. References to Gang Affiliation

## A. Denial of Motion in Limine

The defendant contends that the trial court erred in denying his motion in limine to exclude references to gang affiliation, arguing that such references "unduly excited the emotions and prejudice of the jury to deny [the defendant] a fair and impartial trial." The State argues that the gang references were relevant to show the motive and intent behind the shooting and were not offered to prove that the defendant was a gang member or to show that he acted in conformity with the character trait of a gang member.

This court has previously concluded that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001). Rule 404(b) of the Tennessee Rules of Evidence provides as follows:

> (b) Other Crimes, Wrongs, or Acts.– Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. See State v. Shropshire, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). When the trial court has substantially complied with the requirements of Rule 404(b), this court reviews its decision to admit or exclude evidence under an abuse of discretion standard. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

In a pretrial hearing, defense counsel argued that the trial court should exclude any reference to gangs or gang affiliation because the "mere mention of the words Vice Lords, Gangster Disciples, whatever, Crips, Bloods, is so overly prejudicial as . . . to overcome the relevancy that it might have." Defense counsel asserted that the defendant never admitted that he was a gang member and that any testimony identifying him as such was hearsay. In overruling the defendant's motion to exclude the evidence, the trial court found that the defendant's statement that the motive for the shooting was a Vice Lords hit was relevant evidence and that defense counsel was free to cross-examine the witnesses about any references to the defendant's gang affiliation. Implicit in the trial court's ruling was the additional finding that the probative value of the evidence outweighed the danger of unfair prejudice to the defendant.

We find no abuse of discretion in the trial court's ruling in this matter. The references to gang affiliation and the fact that the murder resulted from a gang "hit" were relevant to show the motive and intent for the shooting. Furthermore, in our view, the probative value of the evidence outweighed the danger of unfair prejudice.

## B. Improper Comments by Prosecutor

The defendant additionally argues that it was plain error for the prosecutor to mention his gang affiliation during opening and closing statements. During both opening and closing statements, the prosecutor referred to the portion of the defendant's statement in which he said that the shooting was a Vice Lords "hit," in support of his argument that the murder was premeditated. Defense counsel, in turn, argued in closing that the defendant, although present, had no prior knowledge that his companions were planning to shoot anyone. In response, the prosecutor made the following remarks during rebuttal:

> I'll tell you one thing that's not simple about this case. And that is that on April 11th, 2002, Montrell Graham was executed. That's not simple. And what else is not simple is Vice Lord justice. Because on April 11th, 2002 [the defendant], Maurice Thomas, and Thaddeus Johnson, planned, prepared for and attempted to execute, had a get-away, and a cover-up, to kill Maurice Wooten.

The State argues that the prosecutor's comments were supported by the evidence at trial and, thus, were not improper. We agree with the State. Counsel for both the State and the defense have traditionally been permitted wide latitude in arguing their cases to the jury and trial judges afforded wide discretion in their control of those arguments. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Nonetheless, a party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may

draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

We find nothing improper about the prosecutor's comments in this case. The prosecutor was merely relying on the defendant's statement, which was admitted into evidence, in advancing his argument that the shooting was a premeditated act in which the defendant had participated. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## II. Denial of Motion to Suppress Statements

The defendant next contends that the trial court erred in denying his motion to suppress his statements to the police, arguing, among other things, that "his confession was the product of an illegal promise by Eddie Bass [and] Sergeant Morgan to 'work everything out.'" When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. See U.S. Const. Amend. V; Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)).

In denying the defendant's motion to suppress, the trial court found that the defendant's statements were freely and voluntarily made and were not the product of coercion or promises:

[T]he Court finds that both statements were freely and voluntarily given by this defendant. That no coercion . . . was brought upon this defendant, no threats or promises. The defendant did not indicate that there were any threats or promises made to him. Maybe he may have said a promise was made that they were going to try to take care of him or something to that effect, and his cousin said something, I'll try to help you if you tell the truth. Something to that effect. But I have no indication that a cousin talked to him. I have indication from the officer that he hadn't seen this cousin that's supposed to have been in there and – not while he was there. The officer, Lieutenant Craig, indicated that patrol officers are not allowed to come in and start talking to people that they have for homicides unless it goes through the coordinating officer. And he said he had no knowledge of that.

The Court['s] of the opinion that . . . these statements were freely and voluntarily given and can be admitted into evidence at this time and will overrule your Motion to Suppress these statements.

The record supports the trial court's findings. The defendant asserts that his cousin coerced him into making the statement by his implied promise that the officers would "work everything out" if the defendant told them what he knew of the crime. However, Lieutenant Craig's testimony, which was accredited by the trial court, established that the defendant's cousin was not present during the interviews and could not have gained access to the defendant without Lieutenant Craig's permission. Lieutenant Craig also testified that the defendant was advised of his rights before giving each statement and that he signed the advice of rights form and initialed and signed the statements. The defendant himself testified that he was a high school graduate, could read and write, and had signed the advice of rights form and the statements. He further acknowledged that he knew he could have had a lawyer present during questioning if he had desired one. In sum, the evidence supports the trial court's finding that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights. Accordingly, we conclude that the trial court did not err in denying the defendant's motion to suppress his statements.

### III. Sentencing

As his final issue, the defendant contends that the trial court imposed an excessive sentence. Specifically, he argues that the trial court erroneously applied enhancement factor (3), the defendant was a leader in the commission of an offense involving two or more criminal actors; enhancement factor (4), the offense involved more than one victim; and enhancement factor (11), the defendant had no hesitation about committing a crime when the risk to human life was high, to his sentence for attempted murder. See Tenn. Code Ann. § 40-35-114(3), (4), (11) (2003). The State concedes that enhancement factor (4) may have been improperly applied but argues that the misapplication of this single enhancement factor does not warrant a reduction in the sentence when the remaining properly applied enhancement factors carried great weight and there were no applicable mitigating factors.

We note that the defendant was sentenced on February 23, 2006, for an offense that was committed in 2002. As such, he could have elected to be sentenced under the 2005 amendment to the sentencing act by executing a written waiver of his *ex post facto* protections. See Tenn. Code Ann. § 40-35-114, Compiler's Notes. However, although the trial court apparently applied the new law when sentencing the defendant,[6] we have been unable to find the defendant's written waiver in the technical record.

We further note that recent developments in the law, which occurred after the date of the defendant's sentencing, make all three enhancement factors applied by the trial court problematic. In Cunningham v. California, 549 U.S. __, 127 S. Ct. 856 (2007), the United States Supreme Court concluded that California's sentencing scheme was unconstitutional because it allowed a trial judge to enhance a defendant's sentence based on facts found by the judge by a preponderance of the evidence. Id. at 868. Subsequently, the Court vacated the ruling in State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), in which our supreme court had concluded that Tennessee's 1989 sentencing scheme did not violate a defendant's Sixth Amendment right to a jury trial, with directions that the court should reconsider its ruling in the light of Cunningham. See Gomez v. Tennessee, __ U.S. __, 127 S. Ct. 1209 (2007). Accordingly, we remand this case to the trial court for the defendant to be appropriately resentenced either under the old law or, if the defendant has executed the proper written waiver, under the 2005 amendment to the sentencing act.

## CONCLUSION

Based on our review, we affirm the judgments of conviction but remand for the defendant to be appropriately resentenced for his attempted first degree murder conviction.

_____
ALAN E. GLENN, JUDGE

---

[6]As a Range I offender convicted of a Class A felony, the defendant was subject to a sentence ranging from fifteen to twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1) (2003 & 2006). Under the 1989 Sentencing Act, the sentence to be imposed for a Class A felony is presumptively the midpoint of the range unless there are enhancement factors present. Tenn. Code Ann. § 40-35-210(c) (2003). Procedurally, the trial court is to increase the sentence within the range based upon the existence of any applicable enhancement factors and then reduce the sentence as appropriate based on applicable mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The 2005 amendment to the act deleted the language mandating that the sentence for Class A felonies begin at the midpoint of the sentencing range. See Tenn. Code Ann. § 40-35-210 (2006).