IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 25, 2014 at Knoxville

**STATE OF TENNESSEE v. MICHAEL DAVIS**

**Appeal from the Criminal Court for Shelby County**
**No. 12-00037      James M. Lammey, Jr., Judge**

**No. W2013-01122-CCA-R3-CD  - Filed March 26, 2014**

The defendant, Michael Davis, appeals his Shelby County Criminal Court jury conviction of second degree murder, challenging both the sufficiency of the convicting evidence and the trial court's refusal to instruct the jury on accident.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Barry W. Kuhn (on appeal); and Nicholas Cloud and Michael Johnson (at trial), Assistant District Public Defenders, for the appellant, Michael Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Christopher West and Kenya Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On November 29, 2011, the defendant fatally shot the victim, Lataska Applewhite, at her residence in Memphis.  The Shelby County grand jury charged the defendant with second degree murder, and the trial court conducted a jury trial in February 2013.

At trial, Marvis Applewhite testified that she was the victim's mother and that she last saw her daughter alive on Monday, November 28, 2011, before she left to go to work. Ms. Applewhite testified that, at the time of the victim's death, the victim was residing at 329 Stoneham with the defendant.  Ms. Applewhite also identified a series of photographs of the defendant's customized, reddish-orange Chevrolet Suburban, explaining that she was

familiar with the defendant's vehicle because the defendant always drove it and parked it directly in front of the Stoneham residence. On cross-examination, Ms. Applewhite agreed that the victim was also known as "Tasha."

A stipulation of fact between the State and the defendant that was read to the jury provided:

Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:

1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182,

2. That Michael Davis called 911 four times on the morning of 11-29-11,

3. That the attached disc is a true and accurate copy of all the calls and conversations recorded by 911 concerning 329 Stoneham, Memphis, TN on the morning of 11-29-11.

Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

Joshua Wood with the Memphis Fire Department ("MFD") testified that he was employed as both a firefighter and a paramedic with the MFD. In the early morning hours of November 29, 2011, he was "on the ambulance as a paramedic" when he was dispatched to 329 Stoneham to attend to "a fall victim." Mr. Wood testified that the 911 dispatcher was confused because two addresses had been provided for the fall victim. Mr. Wood and his partner proceeded to the Stoneham residence address. Upon their arrival, Mr. Wood noticed that the house was completely dark, which he testified was unusual, stating that "if you make a 911 call . . . they're going to flip on the porch light." Mr. Wood arrived just before 2:00 a.m., and he and his partner discovered the front door of the residence was unlocked, but a pit bull was barking aggressively just inside the front door. Because they are trained not to enter a residence until an aggressive dog has been secured, Mr. Wood's partner began to call out to anyone inside the residence, and he received no response. Mr. Wood and his partner then circled the house, hoping to hear someone calling out for them. As they returned to the front of the house, a man driving a Chevrolet Suburban arrived at the house and yelled through his car window that "'[s]he's in the bedroom. She's bleeding from the head. Get inside and help her.'" Mr. Wood responded that he and his partner could not get past the dog.

The man in the vehicle stated that "'[s]he's bleeding to death" and that "'she's hit her head.'" The man rushed into the house, grabbed the dog by the collar, and backed away from the front door. Mr. Wood described the man as a light-skinned, African-American man of average height with short hair, and he estimated his age to be mid-30s to mid-40s.

The man directed Mr. Wood and his partner to a back bedroom in the residence. When they entered the bedroom, they discovered the victim positioned in the floor on her side "with a blood-soaked towel covering her head and . . . there's blood all over the bed." Mr. Wood immediately realized that the victim's injuries were not the result of a fall. Because of the amount of blood loss, the lack of a pulse, and the fact that the victim was cool to the touch, Mr. Wood surmised that the victim was deceased. Mr. Wood asked his partner to give him the cardiac monitor so that they could check for any sign of life, but Mr. Wood commented that he believed the victim was already dead. At that time, Mr. Wood heard the front door slam, followed by the sound of the Suburban leaving the scene.

After verifying that the victim was deceased and noticing a bullet entrance wound on the victim's body, Mr. Wood's partner notified police dispatch to respond to the scene of a murder.

Officer Antoine Wellington with the Memphis Police Department ("MPD") testified that he was dispatched to 329 Stoneham in the early morning hours of November 29. Upon his arrival, he learned that the victim was deceased, and he secured the scene.

La'Monica Applewhite, the victim's younger sister, testified that she last saw the victim around 7:00 p.m. on November 28. Ms. Applewhite stated that the victim was "fine" and that the two of them were discussing plans for the victim's birthday, which was on Christmas Day. Ms. Applewhite stated that the victim was cooking dinner while they talked, and Ms. Applewhite departed after 15 to 20 minutes.

Sometime between 1:30 a.m. and 2:00 a.m. on November 29, Ms. Applewhite, who lived four houses away from the victim, was awakened by a call on her cellular telephone from the defendant. Ms. Applewhite testified that the defendant informed her that "there had been a scuffle" with the victim, that "the gun accidentally went off," and that Ms. Applewhite should go to the victim's house and "check on her." Ms. Applewhite proceeded to her front door and saw "ambulance lights" in front of the victim's house. Ms. Applewhite ran to the victim's house, but law enforcement officers would not allow her to go inside. Officers escorted Ms. Applewhite to a police cruiser and instructed her to wait in the back of the vehicle. While she was sitting there, she overheard another officer mention a "homicide," at which point she knew the victim was deceased. Ms. Applewhite testified that the defendant called her cellular telephone several times while she was sitting in the squad

car, but she was unable to take the calls because the officers had confiscated her telephone.

On cross-examination, Ms. Applewhite acknowledged that she did not answer the first call the defendant made to her on the morning of November 29. She also admitted that the victim had arranged for the defendant to pay the victim's mortgage if the victim had to report to jail in January on a juvenile matter.

MPD Sergeant Vivian Murray with the homicide bureau testified that, as part of her investigation, she learned that the defendant was a possible suspect in the victim's murder and that he had been located in Bexar County, Texas.

MPD crime scene investigator Eric Carlisle testified that he was responsible for taking measurements and collecting evidence at the scene as well as drawing a sketch of the crime scene. Officer Carlisle testified that he recovered a .22 caliber revolver from a drawer in the nightstand of the victim's bedroom.

On cross-examination, Officer Carlisle testified that the condition of the victim's bedroom made it appear as if a struggle had occurred. Officer Carlisle admitted that there appeared to be a bullet hole in the wood floor near the foot of the victim's bed, and he saw an apparent bullet hole in the door leading to a second bedroom.

MPD crime scene investigator Charles Cathey testified that his responsibilities on November 29 included photographing the crime scene and writing a report. Through the testimony of Officer Cathey, the State introduced several photographs depicting the victim and the crime scene, which included photographs of a bloody footprint on some papers scattered on the bedroom floor, blood droplets on the floor of both the bedroom and the kitchen, blood on the victim's bed, and the revolver in the nightstand drawer.

On cross-examination, Officer Cathey admitted that the numerous items strewn about the bedroom were indicative of a struggle. Officer Cathey also admitted that he extracted a bullet fragment from a hole in the floor, but he was unable to determine the bullet's caliber.

MPD Lieutenant Anthony Mullins testified as an expert in bloodstain pattern analysis. Lieutenant Mullins stated that, in November 2011, he was a sergeant assigned to the homicide bureau and that he was the first homicide sergeant on the crime scene. Lieutenant Mullins testified that he observed the victim lying alongside the bed, and he noticed "a lot of blood on the bed" with "some impact spatter and transfers on the bed" along with " a lot of dripped blood on the floor" and "transfer patterns out in the floor . . . like shoe prints." Lieutenant Mullins testified that a small amount of blood evidence was found in the

hallway and in the kitchen but that the vast majority of the blood evidence was contained in the victim's bedroom.

Based on the position of the victim's body and Lieutenant Mullins's analysis of the bloodstain pattern, he offered the following opinion:

> My opinion is, like I've said, when she is shot, she is at the bed. Now, again, I'm not going to try and tell you that she's standing her full height or bent over the bed or kneeling on the bed or lying on the bed; but based on the lack of blood on her clothes from the pooling that you saw on the bed, at least her head is on the bed; and she laid there for enough time for that blood to pool. It could be just a matter of a few minutes; and the[n] somebody – not her – moved her from that position down onto the floor; and when they did that, that's when you started seeing that dripped blood on the floor by the bed and then the drips going toward her head and then the projected pattern by her bed from trying to hold her up; and I'm assuming, based on this, that it's not just quickly throwing her on the floor; that they're trying to lay her on the floor. So, she drips enough blood to spatter somehow. So, somebody has removed her from her original position down onto the floor.

> And to me, the significance is, is the way the call came in to the paramedics was she fell [and] hurt her head. But she did not fall on her own.

On cross-examination, Lieutenant Mullins agreed that the blood patterns were consistent with the victim's being shot near the edge of the bed and with her face lying on the bed for a couple of minutes. Lieutenant Mullins testified that it appeared that the victim had "been moved from the bed and held more or less upright – enough that she is dripping blood" on the floor by the bed. Lieutenant Mullins agreed that "there was some time used to get her down" onto the floor.

Doctor Miguel Laboy, Assistant Medical Examiner for Shelby County, performed the autopsy of the victim. Doctor Laboy testified that he did not observe any evidence of trauma to the victim's upper extremities including her left hand. Doctor Laboy observed a gunshot wound "of close range" to the left side of the victim's face. Based on the gun powder stippling on the victim's face, Doctor Laboy determined that the bullet had been fired from close range, and the rounded shape of the entry wound indicated to Doctor Laboy

that the gun was fired at a 90 degree angle from the victim's face. Doctor Laboy testified that the bullet traveled upward and lodged in the victim's brain. Toxicology testing revealed the presence of marijuana and cocaine in the victim's blood. Doctor Laboy opined that the victim's cause of death was the gunshot wound to the head and that the manner of death was homicide.

On cross-examination, Doctor Laboy confirmed that the bullet recovered from the victim's head was a medium-caliber bullet that was not consistent with a .22, which Doctor Laboy classified as a smaller caliber bullet.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected to testify and to present proof.

April Fleming testified that she had been the victim's best friend and that she had accompanied the victim to juvenile court on November 28, 2011, where the judge had threatened to "lock [the victim] up that day." Ms. Fleming testified that the juvenile court judge had agreed to allow the victim to remain out of jail through the holidays but that the victim was required to return to court in January "to turn herself in." Later that afternoon, Ms. Fleming visited the victim at the victim's home, and Ms. Fleming testified that, although the victim was sad that she would have to go to jail in January, she was also "happy" and "smiling" because she would be able to celebrate her birthday and the new year at home. While Ms. Fleming was present, the defendant called the victim to inquire whether he could bring anything to her house, and the victim asked the defendant to bring cake and ice cream.

Bobby Howard testified that he had known the defendant for approximately 15 years and the victim for approximately 10 years and that he had met them through "the neighborhood." Mr. Howard stated that he saw the victim sometime after midnight on November 29 driving the defendant's Chevrolet Suburban. The victim gave Mr. Howard a ride to her house, where he stayed "probably two minutes," and he never saw the defendant during that time.

Two stipulations of fact between the State and the defendant were read to the jury. The first provided as follows:

> Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:

1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182,

2. That the attached records are true and accurate copies of all phone calls made and received from (901) 643-9182 between 11-28-2011 and 11-29-2011.

Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

The second stipulation provided:

Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:

1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182 and made or received the following phone calls on 11-29-2011,

2. 1:27 called his mother . . . for 27 seconds,

3. 1:36 called 911 . . . for 1 minute 20 seconds, . . .

4. 1:39 called 911 . . . for 1 minute 58 seconds, . . .

5. 1:42 called Lamonica Applewhite . . . for 29 seconds,

6. 1:43 called Lamonica Applewhite . . . for 3 seconds,

7. 1:44 called 911 . . . for 1 minute 27 seconds, . . .

8. 1:46 received a call from his mother . . . for 38 seconds,

9. 1:55 called 911 . . . for 1 minute 52 seconds, . . .

10. 8:03 called The City Court Clerk's Office . . . for 11 seconds,

11. 8:03 called The Public Defender's Office . . . for 8 seconds,

12. 8:10 called The Public Defender's Office . . . for 4 seconds,

13. 8:10 called The District Attorney General's Office . . . for 1 minute 47 seconds,

14. 8:19 called the Criminal Court Clerk's Office . . . for 33 seconds,

15. 8:19 called the District Attorney General's Office . . . for 1 minute 17 seconds,

16. 8:35 called the District Attorney General's Office . . . for 10 minutes 32 seconds,

17. 8:46 called the District Attorney General's Office . . . for 8 seconds,

18. 8:46 called Missy Branham, Assistant District Attorney General, . . . for 1 minute 31 seconds,

19. 8:48 called Missy Branham, Assistant District Attorney General, . . . for 8 seconds,

20. 8:48 called the District Attorney General's Office . . . for 51 seconds,

21. 8:50 called Missy Branham, Assistant District Attorney General, . . . for 2 minutes 18 seconds,

22. 8:53 called Coleman Garrett, Attorney, . . . for 1 minute 31 seconds,

23. 8:54 called Coleman Garrett, Attorney, . . . for 5 minutes 7 seconds.

Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

The defendant testified that he met the victim in 1996 and that the two of them began dating in May 2011. The defendant moved into the victim's house in late July or early

August 2011. The defendant testified that, when he arrived at the victim's house on November 28, 2011, the victim "was very upset" due to the events that had transpired earlier in the day at juvenile court. The defendant attempted to console her by, among other things, bringing cake and ice cream to the victim. Because the victim was anticipating going to jail in January, she asked the defendant to remain at her house and pay her mortgage for her. Later that evening, the defendant and the victim got into bed to watch a movie, and the defendant fell asleep. The victim roused the defendant around 10:00 p.m. or 11:00 p.m. and asked him for money so that she could purchase a handbag from a friend. The defendant obliged, and the victim left the house to make her purchase. When she returned, she showed the defendant her new handbag, and the victim and the defendant resumed watching the movie. Once again, the defendant fell asleep.

The defendant awoke sometime later when the victim struck him in the abdomen. The defendant testified that the victim was standing over him, yelling and accusing him of infidelity. The victim then threw the defendant's cellular telephone, striking the defendant in the face. The defendant took the telephone and immediately called his mother, explaining that he and the victim had experienced "situations before." The defendant testified that the victim "became irate" and threatened to kill him if he left her. The defendant began packing his things while the victim threw items at him. The fracas continued as the defendant gathered his belongings, and, at some point, the defendant turned to discover that the victim was pointing her .38 revolver at him. The defendant pushed the victim into a wall in an attempt to disarm her, and he "noticed that the weapon was cocked." The defendant described the struggle as follows:

> During the struggle over the weapon, as I – as I – as I grabbed her arm, once I was got up against the wall, I was able to kind of – got her body up against my shoulder, and I could hold her arm, and now I can get a grip – take the weapon away from her – take the top. So, as we struggled over the weapon, and I pulled away, the weapon discharged.

The defendant denied ever touching or pulling the trigger. When the defendant realized that the victim had been shot, he called her name and received no response. He laid the victim on the bed and attempted to apply pressure to the wound, but when the bleeding continued, he moved the victim to a seated position in a corner of the room. He then decided to place the victim on the floor so that "her body weight would apply pressure" to the wound while he called 911. In his first 911 call, the defendant gave a false name and an incorrect address and stated that the victim had fallen. He explained that he was "afraid that the situation would be judged because I have a past." The defendant then placed the gun inside his truck before calling 911 again and providing the correct address.

The defendant testified that he then called Ms. Applewhite and drove away from the house as he tried to determine how to get help for the victim. He returned to the house and discovered that the paramedics had arrived. He screamed at the paramedics, urging them to go inside to help the victim. When the paramedics explained that they could not enter the house because of the dog, the defendant ran into the house and secured the dog. While the paramedics were tending to the victim, he left the house because he was "afraid" and "scared" that he "wouldn't be heard if [he] explained to the police" what had transpired.

The defendant testified that he made several telephone calls later that morning, eventually speaking to a prosecutor who informed him that he needed to contact an attorney. When the defendant contacted attorney Coleman Garrett, Mr. Garrett advised the defendant to turn himself in. Instead, the defendant fled to San Antonio, Texas.

The defendant acknowledged that he had prior felony convictions consisting of two aggravated robberies, two aggravated assaults, and one aggravated kidnapping.

The defendant testified that the victim had fired her .38 at him on a prior occasion, leaving bullet holes in both her bedroom floor and the door of a second bedroom, and that she fired the gun at him on another occasion when he was attempting to leave the house following an altercation. The defendant also testified that the victim had told him that she "had shot a previous boyfriend . . . that had got another woman pregnant while they was together."

On cross-examination, the defendant admitted that he struck the victim in the face during an altercation that had occurred in late October or early November 2011. The defendant also admitted that he did not contact the police after any of these prior altercations with the victim. When asked in which hand the victim was holding the gun on November 29, the defendant confirmed that it was her left hand.

Marion Drake, the defendant's mother, testified that she had spent time with the victim on approximately three occasions. Ms. Drake stated that, when the defendant was with her, the victim would call him repeatedly, which was upsetting to the defendant. With respect to the morning of November 29, Ms. Drake testified that the defendant called her to notify her that he was coming to her house, but he never arrived.

Marty Marmon, the defendant's cousin, testified that he once picked up the defendant following the defendant's release from jail and that he drove the defendant to the victim's house. When they arrived, the victim walked out of her house holding a revolver, claiming that the defendant had cheated on her. The defendant asked for his belongings, and the victim replied that she had put them in his truck. When the defendant attempted to start

the vehicle, the victim informed him that she had unhooked the battery. The defendant was examining the battery when the victim "fired at the tire first," then fired two more shots "going toward [the defendant] by the hood." Mr. Marmon confirmed that the defendant was not hit by any of the shots. The defendant ran to Mr. Marmon's car, and the two of them drove away.

Gina Taylor testified that she had never met the defendant but that, in 2006, the victim had stabbed her during a violent altercation. Ms. Taylor stated that the victim was later convicted of aggravated assault.

Floyd Payne testified that he had been a friend of the victim's for 10 to 15 years. He testified that the victim would often be angry with the defendant and that, on one occasion, he heard the victim fire a gun while arguing with the defendant. Mr. Payne stated that, on another occasion, he saw the victim pointing a gun at the defendant.

At the conclusion of the defendant's proof, the State recalled the victim's mother, Marvis Applewhite, who testified that the victim was right-handed.

The jury convicted the defendant as charged of second degree murder. The trial court conducted a sentencing hearing and sentenced the defendant as a repeat, violent offender to life imprisonment without the possibility of parole. Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his conviction and that the trial court erred by failing to instruct the jury on accident. We consider each claim in turn.

*I. Sufficiency*

The defendant first contends that the evidence is insufficient to support his conviction of second degree murder. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of second degree murder. The evidence established that he shot the victim one time in the head at close range from a 90 degree angle. The medical examiner found no defensive wounds to the victim's hands, which contradicts the defendant's testimony of a struggle. Furthermore, the defendant's claim that the victim was holding the gun in her left hand was challenged by the victim's mother's testimony that her daughter was right-handed. The defendant concealed the murder weapon in his vehicle before providing the correct address to the 911 operator, and he fled to Texas shortly after the murder rather than turn himself into the authorities. Although the defendant's version of events painted the victim as the first aggressor, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not re-weigh such evidence. *See Dorantes*, 331 S.W.3d at 379. The evidence is sufficient to convict the defendant of second degree murder.

## II. Jury Instruction

The defendant argues that the trial court erred by refusing to instruct the jury on accident. We disagree.

Prior to trial, the defendant requested that the trial court provide an instruction on accident, although defense counsel acknowledged that he was unable to find any Tennessee case law or a pattern jury instruction on accident. The trial court declined to provide the requested instruction, informing the defendant that he was still free to argue accident by virtue of arguing that the State failed to carry its burden of proof that it was a knowing killing. In its charge to the jury, the trial court instructed the jury on necessity and self-defense in addition to second degree murder, voluntary manslaughter, reckless homicide, and negligent homicide.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn.

R. Crim. P. 30.  It is not necessary, however, to give a requested instruction if the general jury charge is complete.  *State v. Zirkle*, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995).

In the instant case, the jury instructions provided by the trial court were complete, and the defendant was not impeded from arguing that the shooting was accidental. *See State v. Yul Vance Robinette*, No. 03C01-9611-CR–00430, slip op. at 5 (Tenn. Crim. App., Knoxville, Oct. 29, 1997) (holding that trial court did not err by refusing to instruct on accident when jury was properly instructed on the law and convicted defendant of voluntary manslaughter in the shooting of his wife).  The trial court did not err by refusing to provide an instruction on accident.

### *III.  Conclusion*

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE